Garrett vs. Dickerson.

(Decided February 5th, 1863.)

JOHN W. GARRETT vs. PETER DICKERSON.

In an action for slander, although the defamatory words laid in the declaration may not show that a particular felony was charged with technical precision, yet if they impute the commission of a particular offence, punishable as a crime either at common law or by statute, such declaration will be held to present a substantial cause of action.

In cases of slander, words take their actionable character from the sense in which they appear to have been used, and that in which they are most likely to be understood by those who hear them.

The Act of 1809, ch. 153, embracing substantially the provisions of the Act of 1785, ch. 80, sec. 4, vested the Courts with power to order and allow any amendment in the proceedings before verdict, but not after swearing the jury, without withdrawing a juror.

The Act of 1809, ch. 153, was so far modified by the Act of 1852, ch. 177, as to authorize amendments which do not change the substance of the issues, to be made after the jury are sworn, without withdrawing a juror.

The only effect of privilege on actionable words, is to rebut the legal inference or presumption of malice.

The question, whether words sufficient in themselves to raise the legal presumption of malice, are privileged, is one of law, determinable from the circumstances leading to and attending their utterance; but words ascertained to be privileged, as matter of law, still involve the element of good faith in speaking them, and, in general, evidence of any act or circumstance tending to show the want of good faith, may be offered to remove the protection of privilege, and show the existence of malice.

Although the occasion of speaking the actionable words may be such as to justify the legal inference of privilege, yet the jury may look to the words themselves, in connection with other facts and circumstances than those from which the privilege is deduced, in passing upon the question of express malice, and evidence of any other words or acts having reference to the subject matter of the actionable words, may be submitted to the jury for the same purpose, whether such other words or acts were spoken and done before or after suit brought.

APPEAL from the Circuit Court for Baltimore county.

This was an action for slander, brought by the appellee against the appellant, at the May term, 1857, of the Superior Court of Baltimore city, and afterwards removed, upon the suggestion and affidavit of the appellant, to the Circuit Court for Baltimore county.

The declaration contains two counts. The first count charges, "that a certain Jacob Miller, now deceased, had, in his lifetime, for a long space of time been employed and entrusted by the Baltimore and Ohio Rail Road Company as their agent, in the custody and charge of the stables and horses belonging to said company, at Mount Clare, and the said plaintiff had also been acting and employed for a long space of time as the agent of the said Baltimore and Ohio Rail Road Company at Locust Point, in the city of Baltimore, and as such agent, the said plaintiff during all such time had the charge, care and custody of all the wood belonging to said company at said Locust Point;" and that both the plaintiff and the said Miller, before words complained of were spoken, "had been discharged from their said employment and agency." The alleged defamatory words and *innuendoes* were set forth in this count as

follows: "One of your first acts, Mr. President," (mean-
ing a certain Chauncey Brooks, who was then and there
the president of the said company,) "was to visit the sta-
bles of Mount Clare, and you there found a deficiency of
thirty-seven horses, the value of which had gone into the
pocket of a dishonest employee," (meaning the said Jacob
Miller.) "At Locust Point, a similar dishonest appropri- ·
ation of the company's wood was discovered," (meaning
thereby that the wood belonging to said company at Locust
Point, had been dishonestly appropriated;) "the parties to
these frauds" (meaning the said Miller and plaintiff) "were
discharged," (meaning that the discharge of said Miller
and plaintiff, as aforesaid, was on account of their dis-
honest conduct in the premises.)

The second count sets forth the words and *innuendoes* as
follows: "At Locust Point, a similar dishonest appropri-
ation of the company's wood was discovered," (meaning
that the wood belonging to the said company, and in the
charge and custody of the said plaintiff, had been dishon-
estly appropriated;) "the parties to these frauds were dis-
charged," (meaning thereby that the plaintiff was a party
to a fraud, and had been discharged on account thereof.)

The defendant pleaded that he did not commit the wrongs
alleged.

After the jury was sworn, and before the rendering of
the verdict, the following amendment of the pleadings and
agreement were filed:

"The plaintiff, with leave of the Court here first obtain-
ed, amends his *nar.* at bar in the following particulars:
1st. In the first count, after the word 'employed,' strike
out the word 'intrusted.' 2nd. In the first count, after the
words 'had been and was guilty of,' strike out the word
'fraud.' 3rd. In the first count, after the words 'which had
gone into the pocket of a dishonest employee,' strike out
the words in brackets, ('meaning the said Jacob Miller,')

and insert the words ('meaning that the said Miller had feloniously embezzled and appropriated to his own use thirty-seven horses, under his charge as agent aforesaid.') 4th. In the first count, after the words 'company's wood was discovered,' strike out the words in brackets, and insert in lieu thereof the following words, ('meaning that the plaintiff had dishonestly and feloniously embezzled and appropriated to his own use the wood of the said Rail Road Company, so under the plaintiff's charge as such agent at Locust Point, aforesaid.') 5th. In the second count, after the words 'had been dishonestly,' insert the words 'and feloniously,' and after the word 'appropriated,' insert the words 'by the plaintiff to his own use.'"

The agreement is in these words: "It is agreed that the above amendments are to be considered as made at bar, with leave of the Circuit Court of Baltimore county, in which the said cause was tried." This agreement was signed by the respective attorneys of the plaintiff and defendant.

*Defendant's 1st Exception.* Joshua Atkinson, the secretary of said Board of Directors, proved that at a meeting of the Board, on the 18th of March 1857, the following resolution was offered: "Whereas, matters of much importance may come before the Board to-day, in which the community at large feel a deep interest, and of which they should be fully and correctly informed, be it resolved, that one or more of the reporters of the press be admitted on this occasion to this room." That to this, John W. Garrett moved the following as a substitute, which was adopted: "Resolved, that until the further action of the board on the subject, the reporters for the press be admitted at its meetings."

The plaintiff's counsel then read the following agreement, signed by the counsel of the parties, and filed in the cause: "It is admitted in this case, that the words were

spoken by the defendant in debate, at a meeting of the Directors of the Baltimore and Ohio Rail Road Company, as they are alleged in the *nar*. That at the time they were spoken, the defendant was a sworn director in the said company, and that they were spoken in the presence of his co-directors, the president of the company, and of the reporters for the public press, at a meeting of the Board on the 18th of March 1857. It is further admitted, that the plaintiff, Peter Dickerson, had been the agent of the company, in charge of their wood at Locust Point, from which post he had been discharged by the said company previously to the speaking of the words, as aforesaid."

The plaintiff further proved, that the words charged in the declaration to have been spoken, were used by the defendant in a discussion is reference to the comparative merits of the administrations of William G. Harrison, a former president, and his successor, Chauncey Brooks, then president; and that a report of the said remarks was published in the "Baltimore American" newspaper, on the 19th of March 1857. And also proved by Wendell Bollman, an employee of the company, that between the periods of the 18th of March 1857, and the trial of the suit of *Dickerson vs. The Balto. & Ohio Rail Road Co.*, that is, between March 1857, and July 17th, 1858, he was present on the premises of John S. Gittings, Esq., a director, in company with Mr. Brooks, the President of the Baltimore and Ohio Rail Road Company, the defendant, two other directors of the company, and its counsel, Mr. Latrobe, and that on this occasion the defendant asked the counsel for the company if he was preparing for the trial of the suit brought by Dickerson against the company? That the counsel replied that he thought it as well to drop the suit, and that the defendant said in reply, "that he wanted to bring on said suit, as he wanted to show up all the villiany of these men."

Garrett *vs.* Dickerson.

The plaintiff then read so much of said record as showed the matters in issue in said cause, with a view to explain the subject matter of the defendant's said remarks. But the Court, on motion of the defendant's counsel, rejected so much of said record as relates to the verdict and judgment in said case; and thereupon the defendant's counsel prayed the Court to instruct the jury as follows:

"The defendant prays the Court to instruct the jury, that although they may find from the evidence that the defendant uttered the words laid in the declaration, yet if they shall also find that at the time of speaking them, the defendant was a sworn director of the Baltimore and Ohio Rail Road Company, and that he spoke them in debate, at a meeting of the directors of that company, as given in evidence, then that the jury must find for the defendant, there being no evidence of express malice on the part of the defendant in the uttering of said words." But the Court refused so to instruct the jury, and the defendant excepted.

*Plaintiff's 3rd Exception.* This exception presents the defendant's second prayer, predicated on the testimony detailed in the defendant's first exception, which is as follows: "That although the jury may find that the defendant spoke the words laid in the declaration, yet if they shall also be satisfied from the evidence, that at the time he spoke them, he was a sworn director of the Baltimore and Ohio Rail Road Company, and that they were uttered in the course of a debate at a meeting of the Board of Directors of that Company, as given in proof, then that the plaintiff is not entitled to recover, unless the jury shall also be satisfied from the evidence, that they were spoken by the defendant from express malice, that is, out of personal spite or ill-will on his part towards the plaintiff, and that there was no such express malice, if the jury shall find from the evidence, that at the time of uttering the words, the defendant had probable cause for believing them

true, and uttered them because he believed them.'' Which
prayer the Court granted, and the plaintiff excepted.

Other exceptions taken at the trial, as well as the argu-
ments on both sides relating thereto, being immaterial
in the view of the case taken by this Court, are omit-
ted.   The verdict of the jury being in favor of the
plaintiff, the defendant moved in arrest of judgment, but
said motion was overruled, and judgment entered for the
plaintiff.   Appeals were taken both by the plaintiff and
defendant, but the only questions decided by this Court
arise on the defendant's first exception.

The cause was argued before BARTOL, GOLDSBOROUGH and
COCHRAN, J.

*C. J. M. Gwinn* and *J. Mason Campbell*, for the appel-
lant:

Had the Court the right to allow the pleadings to be
amended at bar, or to treat the memorandum of amend-
ments as an amendment at bar, without requiring a juror
to be withdrawn, and the jury to be re-sworn?

The Act of 1785, ch. 80, sec. 4, authorized Courts of Law
to order and allow amendments to be made in all proceed-
ings whatever, before verdict, so as to bring the merits of
the question between the parties fairly to trial; and it di-
rected, that where the amendment was made after the jury
was sworn, a juror should be withdrawn, and the adverse.
party should have time allowed him, in the discretion of
the Court, to prepare to support his case on the state of
the proceedings as amended.   The Act of 1809, ch. 153,
sec. 1, re-enacted the body of this provision, adding only
to it the further provisions, that the case should not be
continued until the next term, unless the Court should be
of opinion that the same was necessary.   The Act of 1852,
ch. 177, sec. 1, enlarged the privilege conferred by the Acts

of 1785 and 1809, so as to enable the writ or summons even to be amended.

Now how are these three Acts to be construed? In so far as they are remedial statutes, each and all are of course to be construed liberally, but in so far as they are in derogation of the rights of parties existing at common law, they are to be construed strictly. Nor are these the only rules which are to be kept in mind in construing these three statutes. We are to keep in mind the rule, that since they are all in *pari materia*, they shall, if possible, have such a construction that the last Act may not work a repeal of the former Acts, by implication. *Dwarris on Stat.*, 674. In a word, the Act of 1852, ch. 177, having in it no negative words, shall not dispense with the positive provisions of the Act of 1785, and of 1809, which required that in case of such amendments being made, a juror should be withdrawn. *Sedgwick on Constitutional Law*, *p.* 123, *Ed.* 1857. *Dwarris on Stat.*, 532. The cases in Maryland, which sustain this rule in the construction of several statutes in *pari materia*, are very numerous. In the case of *Mayor & City Council vs. Howard*, 6 *H. & J.*, 392, Buchanan, C. J., says: "The objection that the ordinance of the 9th of March 1807, does not designate the persons who are liable to pay the paving tax, at first view has more force; but however strong it may be considered, it must yield to the principle, that all statutes made in *pari materia* are to be taken and construed together, as if they were one system. 9 *Bacon Abr.*, *tit. Statute*, (I) 3. *Rex vs. Loxdale*, 1 *Burr.*, 447. *Church vs. Croker*, 3 *Mass.*, 21. And that, though not expressly referring to each other, and even after one has expired or been repealed. The case of *Baltzell vs. Foss*, 1 *H. & G.*, 506, decided by Archer, J., is a very clear instance of the application of this rule. The Act of 1785, ch. 72, required that the personal estate of a deceased should prove insufficient for the

payment of debts, before the real estate should be sold. The Act of 1794, ch. 60, sec. 2, authorized the sale of lands for payment of debts, without making any provision as to personal estate. But it was held, that the two laws must be construed together, and that the personal estate should be proved insufficient before the real estate should be sold. See, for the same rule of construction, *State, use Wash. County, vs. Balto. & Ohio R. R. Co.*, 12 *G. & J.*, 431. *Dugan vs. Gittings*, 3 *Gill*, 154. *Ranoul vs. Griffie*, 3 *Md. Rep.*, 60. *State vs. Mister*, 5 *Md. Rep.*, 14. *Keller vs. State*, 12 *Md. Rep.*, 323. *Campbell vs. Lowe*, 9 *Md. Rep.*, 509.

Nor can it be contended, successfully, that the argument arising from the construction of the Acts of 1785, 1809 and 1852, as statutes in *pari materia*, is met by the reply, that the Act of 1852 was intended to cover the whole subject. It will be seen, presently, that the operation of the Act of 1852, ch. 177, so construed, would result in an evil, which would oblige the Court, even if that statute stood alone, to declare that certain cases were excluded from its operation, as necessarily not within the intention of the makers, though within the letter of the statute. See *State vs. Boyd*, 2 *G. & J.*, 374. *Mayor & City Council of Baltimore vs. Root*, 8 *Md. Rep.*, 105. For if the Act of 1852, ch. 177, be taken as covering the whole subject of amendments in pleadings in civil actions, it certainly follows that a plaintiff, under the broad power seemingly conferred by that Act, may always, by leave of Court, and possibly without leave of Court, wholly change the issues which he elected to make by his pleadings, after the jury had been sworn on these issues, and these issues only, after evidence given and argument made on the original issues only, and just before the jury retire to consider of their verdict.

Can it be possible that the Act of 1852 intended to allow any party to a cause so broad and dangerous a power, or

designed to permit a Court to afford to a party the right to present issues to the consideration of a jury, in reference to which that jury had not been sworn?

Besides, if this law of 1852 be construed as dispensing with the provision for the withdrawal of a juror, contained in the Acts of 1785, ch. 80, sec. 4, and 1809, ch. 153, sec. 1, how is the Court to exercise the power of granting a continuance, which is given in the 9th section of the Act of 1852? Clearly it can do so in no other manner than by directing the withdrawal of a juror, so as to make it impossible to proceed with the cause at the pending term to which the jury empannelled was summoned. If an order of continuance was passed without such withdrawal of a juror, the effect would be to continue the jury sworn in the cause and not discharged, in service at some other term than that to which it was summoned. How is a Court enabled to extricate itself from this absurdity? It cannot direct a juror to be withdrawn before granting a continuance, by reason of any common law power, because at common law the withdrawal of a juror is a matter not dependent upon the authority of the Court, but upon the agreement of the parties. 2 *Tidd's Prac.*, *Am. Ed.*, 910. It can only exercise the power of granting a continuance, under the Act of 1852, ch. 177, sec. 9, upon the theory that it retains the right to direct, of its own motion, the withdrawal of a juror, which was, in contravention of the common law, given to it by the Acts of 1785, ch. 80, sec. 4, and 1809, ch. 153, sec. 1.

Since the Acts of 1852, and of 1785, and 1809, must be construed together, in ascertaining the formalities which the Court must observe in granting a continuance of a cause, does it not appear *a fortiori*, that they must be construed together, in ascertaining what formalities are necessary in order to the just and regular trial of the issues involved in that cause?

The very point which we are now discussing, was alluded to by the Court in the case of *Lohrfink vs. Still*, 10 *Md. Rep.*, 535; but it was not decided; Bartol, J., intimating that it was by no means free from difficulty. In the ·case of the *Baltimore Fire Ins. Co. vs. McGowan*, 16 *Md. Rep.*, 49, 53, it appears that the jury were re-sworn after the amendments were made in the writ and *narr.*, and that the Court (LeGrand, C. J.) plainly relies upon this re-swearing of the jury as an element in that cause of the proof of the proper application of the Act of 1852, ch. 177.

In fine, it would appear that the Act of 1852, ch. 177, must be construed in subordination to the Constitution, and in ‚connection with the Acts of 1785, ch. 80, sec. 4, and of 1809, ch. 153, sec. 1; and, therefore, the first section of the Act of 1852, ch. 177, must be read as if it contained the proviso, that if "an amendment is made after the jury is sworn, a juror should be withdrawn," and the ninth section of the same Act must be understood as providing for the immediate re-swearing of the jury on the new issues presented by the amended pleadings, and then for the proceeding of the cause between the parties, as if no amendment had been made, unless, as is provided for in the ninth section, the Court shall be satisfied that the ends of justice require a continuance.

But if the Court should be of the opinion that the appellee had the right to amend the original *narr.* without withdrawing a juror, still we insist that the *narr.*, as amended, is itself defective, and that the motion made in arrest of judgment ought to have prevailed, because of such defects.

The Act of 1820, ch. 162, sec. 2, which creates the crime supposed by the appellee to be imputed to him by the words laid in the amended declaration, is copied from the English Acts of 7 and 8 Geo. IV, ch. 29, sec. 47. The Act of 1820, ch. 162, sec. 2, does not make the fraudulent

embezzlement, secretion or making away with the property to which it refers, the offense of *fraudulent embezzlement, secretion, or making away,* but declares that the person committing such acts shall be deemed guilty of having *feloniously stolen* the same from his employer or employers. Therefore it is plain that where words are laid in a declaration, which require an innuendo to set forth that they were intended to impute an act of a criminal nature, that innuendo should definitely express the crime which it may allege was intended to be charged; that is to say, in this particular case the amended *narr.* in the various innuendoes which it contains, ought to have said, "meaning that the plaintiff had feloniously stolen the wood of said rail road company," &c., for there is no such crime under the Act of 1820, ch. 162, sec. 2, as felonious embezzlement and appropriation of property, though there is under that Act a new variety of the crime of larceny created, when it shall be shown that a party has *fraudulently* embezzled property belonging to his employer.

Nor can these defective innuendoes in the amended *narr.* be regarded as free from objection, on the ground that any innuendoes in this particular case were unnecessary. Innuendoes are not superfluous, except in cases where the words used do in themselves necessarily import the imputation of a punishable offense. It has been sufficiently shown, we think, that the words themselves, as spoken, were not sufficient, without such an innuendo to aid them.

In general, we may call the attention of the Court to a principle which is, we think, capable of easy elimination from the authorities upon this subject. It is this: where the words do not of themselves import the imputation of a statutory crime, it is necessary that the innuendo should clearly indicate the particular statutory crime which it is alleged was intended to be imputed by the words used. We do not say that the innuendo must describe the offense

technically, but we do say that it must describe it correct-
ly. It will be plain to the Court, that the description
given in the appellee's amended *narr.* is not a correct de-
scription; for there is no such offense as felonious embezzle-
ment and appropriation, though there is a case of statu-
tory larceny when a fraudulent embezzlement has taken
place.

We say further, that even if the form and substance of
the innuendoes in the amended *narr.* were sufficient, yet
that judgment upon the verdict in this case ought to have
been arrested, because the words laid in the declaration do
not support the broad and extended meaning attributed in
the innuendo. The office of an innuendo is to explain by
pointing out the defendant's allusion, and it can in no case
be allowed to introduce new matter, or to extend the mean-
ing of the words set out in the declaration. *Starkie on
Slander, ed.* 1858, *m. p.* 421, 431.

Whenever an innuendo is so used as to seek to extend
the meaning of the words used in the *narr.* beyond the line
of their natural signification, the Court must hold that the
innuendo is defective, because the words used do not in law
suffice to maintain the averment founded upon them by
way of innuendo. And although a jury may have found
in accordance with the averments of the innuendo, the
Court, on motion in arrest of judgment, will look at the
words laid in the *narr.* and sustain the motion in arrest of
judgment, if the innuendo is an improper expansion of the
words so laid in the *narr.*

Unless this were so, it would be impossible for a defend-
ant to protect himself against the improper uses of an in-
nuendo. Expressions which were naturally and in them-
selves free from legal objection, might be made fruitful of
injury to their utterer, by the extended application of an
innuendo. It would not be prudent ever to disregard the
opinion of Lord Coke, that it is dangerous to demur in

such cases. But we should be shut out from the benefit of his counsel to leave such matter of law *ad ultimum;* that is to say, to a motion in arrest of judgment, unless the Court was prepared to give to such a motion the benefit of its real purpose and object in such cases. Under such a motion, the primary enquiry is, whether the words laid in the declaration naturally and properly afford evidence in themselves that the defendant imputed any crime to the plaintiff? If they do not, no innuendo or other averment is admissible to supply the proof which the law requires should be found in the very words used, when these words are viewed by the light of the circumstances surrounding their expression.

The motion in arrest of judgment made in this cause, brings up all these points. That motion is not limited in its operation to the specific reasons which it assigns, because such motions are not within the Act of 1825, ch. 117. It brings the whole record to the view of the Court of Appeals. *Sothoron vs. Weems,* 3 *G. & J.,* 441. *Charlotte Hall vs. Greenwell,* 4 *Id.,* 416. *Sasseer vs. Walker's Ex.,* 5 *G. & J.,* 110. *Morgan vs. Briscoe & Clark,* 4 *Md. Rep.,* 273. *Cushwa vs. Cushwa,* 9 *Gill,* 248. *Keller vs. State,* 12 *Md. Rep.,* 328. *Evans' Prac.,* 300.

Was the Court justified in refusing to instruct the jury that there was no evidence of express malice on the part of the defendant in uttering the words complained of? It is claimed by the appellee that such evidence of express malice is found in the testimony of Wendell Bollman, who says "that he was an employee of the company between the periods of the 18th March 1857, and the trial of the suit of *Dickerson vs. The Baltimore & Ohio Rail Road Company,* that is, between March 1857, and July 17th, 1858, he was present on the premises of John S. Gittings, Esq., a director, in company with Mr. Brooks, the President of the Baltimore and Ohio Rail Road Company, the defendant,

two other directors of the company, and its counsel, Mr. Latrobe, and that on this occasion the defendant asked the counsel for the company if he was preparing for the trial of the suit brought by Dickerson against the company? That the counsel replied, that he thought it as well to drop the suit, and that the defendant said, in reply, that he wanted to bring on said suit, as he wanted to show up all the villiany of these men."

Now when it is considered that the defendant, at the time of the conversation with Mr. Latrobe, was a sworn director of the company, (1826, ch. 123, sec. 10,) talking with the President, a sworn officer, in the presence only of other sworn directors and officers of the company, of whom this witness was 'one, in regard to a suit then pending against the company, it is impossible to say that this very communication, thus made to the counsel of the company and relied on as evidence of malice, was not itself a privileged communication. Shall it be said that one of those who were elected to continue the succession of that company, (1826, ch. 123, sec. 7,) and in whom, together with the President and other directors, (1826, ch. 123, secs. 12, 13, 14, 15, 16, 17, 18, 19,) was vested all the power of the corporation, had not a right to express to the counsel of the company his judgment as to the propriety of the early trial of a suit in which the company was interested, and his opinion as to the character of the claim made against the company? The supposition that the defendant believed what he said, is always to be made when the question is whether a communication be privileged or not. *Somerville vs. Hawkins*, 70 *E. C. L. Rep.*, 588. And this supposition existing, was it not the duty of the defendant to express his belief to the counsel of the company, in order that he might, as a director, bring home to the mind of that counsel the necessity of a thorough examination of the claim set up by the plaintiff? Was it necessary for this director,

if he entertained a conviction of the fact which he stated, to cast about for phrases in which he could safely discharge his business duty as a co-ordinate authority in the corporation? Was he to run the risk of being misunderstood, by being compelled to "hint a fault" in this plaintiff? Lord Campbell, in *Taylor vs. Hawkins*, already cited, (71 *E. C. L. Rep.*, 321,) has quoted with approbation a pregnant opinion of Lord Ellenborough's on this point. "The communications of business are not to be beset with actions of slander." The true rule is, that these communications of business are always privileged, when they are "made *bona fide*, in performance of a duty, or with a fair and reasonable purpose of protecting the interest of the party using the words," or what is the same thing, with the purpose of protecting any interest wholly or partially in his charge. *Somerville vs. Hawkins*, 70 *E. C. L. Rep.*, 588.

The persons who were present, were all servants of the company, but even if strangers had heard what passed, the communication would not have lost its privilege. "The simple fact that there had been some casual stander by, cannot alter the nature of the transaction. The business of life could not be well carried on, if such restraints were imposed on this and similar communications, and if on every occasion in which they were made, they were not protected unless strictly private." See the following cases: *Toogood vs. Spyring*, 1 *C. M. & R.*, 192. *Coxhead vs. Richards*, 52 *E. C. L. Rep.*, 593. *Kine vs. Sewell*, 3 *M. & W.*, 301. *Blackham vs. Pugh*, 52 *E. C. L. Rep.*, 617. *Somerville vs. Hawkins*, 70 *E. C. L. Rep.*, 588. *Taylor vs. Hawkins*, 71 *E. C. L. Rep.*, 321. *Harris vs. Thompson*, 76 *E. C. L. Rep.*, 347. *Streety vs. Wood*, 15 *Barb.*, 109. *Amann vs. Damm*, 98 *E. C. L. Rep.*, 600. *Harrison vs. Bush*, 85 *E. C. L. Rep.*, 348. *Cook vs. Wildes*, 85 *E. C. L. Rep.*, 328, 340. *Jellison & Wife vs. Goodwin*, 43 *Maine*, 287.

It is not pretended that there has not been both uncertainty and difference of opinion with regard to the particular questions now under discussion, but the cases principally relied on by the appellee, among others, the case of *White vs. Nicholls*, 3 *Howard*, 266, do not appear to shake the basis of authority and principle upon which the appellant relies for a reversal.

Had the decision to which we refer rested upon a simple reversal of the error alleged to be contained in some of the instructions of the inferior Court, there would be, perhaps, less cause to question it. For the first exception shows a publication of the matter of the alleged libel before its presentation. But the Court goes beyond many of the requirements of the case in its opinion, and lays down certain canons of law as the rules governing in all such cases. To the soundness of these rules, set forth in the opinion of Justice Daniel, we respectfully take exception.

The Court will perceive that one conclusion is apparent from these canons, and from the doctrinal statement of Judge Daniel in their support. It is, that no publication of any writing is absolutely privileged. For he says, in illustration of these canons, on *page* 291, "that malice may be proved, though alleged to have existed in the proceedings of a legislative body." With these canons, thus illustrated, we take plain and direct issue.

The law laid down in them is unsound, because it does not recognize the absolute privilege which the wiser jurisprudence of centuries has accorded to "publications duly made in the course of Parliamentary proceedings." 1 *Starkie on Slander*, 239.

The rules laid down by the Supreme Court in the case of *White vs. Nicholls*, approach more nearly to the doctrines of the Court and King in 1629, than to the liberal principles recognized by a free Parliament and by the highest Court in England in 1667 and 1668.

Garrett *vs.* Dickerson.

The following authorities are also referred to on this point: Const. U. S., Art. 1, sec. 7. *Anderson vs. Dunn*, 6 *Wheat.*, 204. 2 *Story on Const.*, secs. 846 and 866. 1 *Black. Comm.*, 165. *King vs. Wright*, 8 *T. R.*, 296. 4 H. VIII, (Strode's Act,) *Case of William Strond*, *in* 1629. *Croke Chas.*, 181 and 182. 3 *Howell's State Trials*, 312 and 319.

*A. S. Ridgely*, *G. H. Brice* and *R. J. Brent*, for the appellee:

Malice is of two kinds: malice in law, and express malice. In one form or other it is a necessary ingredient in slander, and the declaration usually charges the utterance or publication to have been malicious. *Prima facie* or *implied* malice, which is legally inferred from the bare utterance of the words, may, however, in certain cases, be rebutted by the circumstances and occasion of the utterance, which afford a qualified defence, dependent upon the lawfulness of the occasion, and the absence of express malice, and render it necessary, in order to sustain an action, that such express malice should appear. 1 *Stark. on Slander*, 211 and 292. 1 *Hare & Wallace Amer. Lead. Ca.*, 166.

What is meant by *express* malice, or as it is sometimes called malice *in fact*, may be illustrated by reference to the case of *Moore vs. Stevenson*, 27 *Conn.*, 24 and 30, in which it is held that "the term malice *in fact,* does not necessarily import malignity or hatred towards the plaintiff, but only that the defendant was actuated by *improper and unjustifiable* motives in making the publication."

Now the prayer of the defendant (appellant) is based upon the assumption that there was no evidence in the case of any malice other than that which is ordinarily implied by the mere utterance of defamatory words; and that this

*prima facie* or legal malice is rebutted by the privileged character of the occasion.

The prayer calls upon the Court to say:

*First.* That the occasion was privileged, and that, by reason thereof, the legal malice which otherwise would be inferred from the utterance of the words, is by that privilege rebutted,—the privilege operating in this case precisely as the statute operates in Connecticut.

*Secondly.* It calls upon the Court to say that there is no evidence in the case from which the jury were at liberty to infer any other malice than that presumptive malice which is so rebutted.

Both of these propositions are resisted by the appellee, who contends that the Court were right in rejecting the prayer.

*First.* Because the occasion was not privileged.

*Secondly.* Because the prayer improperly sought to take from the jury the question of express malice.

The rule governing privileged communications is simply this: Where it appears that the words were spoken *bona fide*, in discharge of some legal or moral duty, the occasion affords a *prima facie* presumption of absence of malice, and the plaintiff in an action of slander would fail; but this favorable presumption is dropped, if there was anything connected with the words or the occasion, or if there were any matter or circumstances subsequently occurring which threw light upon the words, or on the disposition of the speaker in uttering them, from which we might rationally infer that they were not uttered from considerations of legal or moral duty; and this is a question for the jury, and is sufficient on their finding to constitute what is termed malice in fact.

It seems to us that the appellant's prayer was rejected in conformity with principles, in the language of Judge Earle, "which are as well settled as those of any other depart-

ments of the law." *Smith vs. Youmans*, 3 *Hill*, 88, *S. Car. R. Toogood vs. Spyring*, 1 *Cr. Mees. & Ros.*, 192.

This view in no wise conflicts with those entertained by the Judges in the case of *Coxhead vs. Richards*, 52 *Eng. C. L. Rep.*, 584, and *Taylor vs. Hawkins*, 71 *Id.*, 321, or any of the class of cases which decide only that "the *prima facie* privilege of the occasion is a question for the Court." The respective duties of the Court and jury are distinct. "Whether the occasion is such as to rebut the inference of malice if the publication is *bona fide*, is a question of law for the Court; whether the *bona fides* exists, is a question of fact for the jury." 1 *Hare & W. Amer. Lead. Cases*, 167 and 168. *Patterson vs. Jones*, 8 *Barn. & Cress.*, 578. 1 *Starkie on Slander*, 300. *Rodgers vs. Clifton*, 3 *Bos. & Pul.*, 591, *qr. Kine vs. Sewel*, 3 *M. & W.*, 297. *Cook vs. Wildes*, 5 *El. & Bl.*, 328.

In the case of *Coward vs. Wellington*, 7 *Car. & Payne*, 531, the Court held, that "malice might be inferred by the jury from the libel itself, or from other circumstances." And in *Wright vs. Woodgate*, 2 *Cr. Mees. & Ros.*, 573, Parke, B., says: "A privileged communication is a communication made on such an occasion as rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the *onus* of proving malice in fact; but not of proving it by extrinsic evidence only; he has still a right to require that the alleged libel shall be submitted to the jury, that they may judge whether there is evidence of malice on the face of it."

"In cases belonging to the class of privileged communication, malice in fact may be inferred from the language of the communication itself, as well as from extrinsic evidence." *Hastings vs. Lusk*, 22 *Wend.*, 421. See also, 2 *Starkie on Slander*, 58, *note* 2; and *Kelly vs. Vortington*, 2 *Nev. & Man.*, 460; 4 *Barn. & Ald.*, 700. Want of probable

cause is evidence of express malice, and the *onus* is in the defendant to show probable cause for his libelling the plaintiff. 1 *Hillyard on Torts*, 236. *Grey vs. Pentland*, 2 *Sergt. & Rawle*, 26, &c. *White vs. Nicholls*, 3 *Howard*, 266. See also, 4 *Sergt. & Rawle*, 423, the case of *Grey vs. Pentland*, wherein the question of want of probable cause is very thoroughly examined by Judge Gibson, and decided to be a circumstance to go to the jury, from which they may infer express malice. *Cooper vs. Stone*, 24 *Wend.*, 442. The presence of the reporters destroyed the privilege, if any might have otherwise existed, and was at all events sufficient of itself to take the case to the jury on a question of express malice. *Padmore vs. Lawrence*, 11 *Adol. & El.*, 380. *Dunman vs. Bigg*, 1 *Camp.*, 269. *Toogood vs. Spyring*, 1 *Cr. Mees. & Ros.*, 192. *Lusk vs. Hastings*, 22 *Wend.*, 421. 21 *How.*, 212.

Not only was the presence of the reporters a circumstance sufficient in itself to carry the case to the jury, but it destroyed all character of privilege in the communication. 1 *Stark. on Slander*, 222. 10 *Eng. C. L. Rep.*, 325.

"If the language exceeded the exigency, that alone will be evidence of malice proper to be weighed by the jury." *Gassett vs. Gilbert, et al.*, 6 *Gray*, 97, 99.

In the case of *White vs. Nichols*, the Supreme Court of the United States, after a most elaborate examination of the same questions, arrived at the following conclusions:

"1st. Proof of malice can never be required of the party complaining, beyond the proof of the publication itself; justification, excuse or extenuation, if either can be shown, must proceed from the defendant.

"2nd. When the publication is a privileged communication, there is an exception to the general rule of law, and in that case the plaintiff is bound to remove all presumptions flowing from the seeming obligations and situations

of the parties, and to bring home to the defendant the existence of malice as the true motive of his conduct.

"3rd. In such cases, falsehood and the absence of probable cause, will amount to proof of malice.

"4th. It is for the jury, and the jury alone, to determine whether a publication is or is not marked with malice; and for this purpose the publication, in connection with any other evidence going to establish the existence of malice, must be submitted to them." *White vs. Nichols, et al.,* 3 *How.,* 266.

And in the present case, the defamatory words, together with the whole circumstances of their utterance, and the subsequent remarks of the appellant, Garrett, to Mr. Latrobe, as testified to by Bollman, ought to have been submitted to the jury; and the Court was right, for this last reason, if for none others, in rejecting the defendant's prayer. 2 *Greenleaf's Ev., sec.* 418. *Pearson vs. Le Maitre,* 5 *M. & G.,* 700.

The declaration in this, as in every other case, properly consists of certain allegations constituting a statement of the plaintiff's claim; whatever facts are necessary to constitute the ground of action shall be stated, and nothing more. 1 *Starkie on Slander,* 356. Act of 1856, Art. 4, sec. 52, p. 151.

In an action of slander, these allegations relate to the act of publication, the matter published, the application of that matter, the motive in publishing, and the damage occasioned by it. 1 *Starkie's Slander,* 358.

As to the matter published, and the application of that matter: The *narr.* must profess to set out the words of the defendant, and these, to be actionable, must impute to the plaintiff a criminal offence; that is to say, the words as laid in the *narr.* must be such that, if true, the plaintiff would be guilty of an indictable and punishable offence.

1 *Hare & Wallace's Amer. Lead. Cases*, 86, 87.    1 *Starkie on Slander*.    *Sheely vs. Biggs*, 2 *H. & J.*, 364.

These words may be either intrinsically actionable, or their illegality may be derived from collateral circumstances; they must be so stated or laid as to be connected with the plaintiff; and when they are not in themselves actionable, they must be connected, with collateral facts, from which their actionable character is derived.    This is done by matter alleged in form of inducement or preparatory averments, a *colloquium*, and, when necessary, innuendoes.    1 *Starkie on Slander*, 362, 383, 388, 391.    Act of 1856, Art. 4, sec. 64, p. 152.

By this process, such extrinsic facts are incorporated, as it were, with the defendant's publication, and a complete slanderous charge appears on the face of the record.    1 *Starkie on Slander*, 392.

The term *colloquium* is used not only in its strict sense, denoting a conversation on the subject of the matters previously averred; but an averment that the words were used of and concerning a particular person, or particular circumstances or subject matter, is called a *colloquium*.    1 *Starkie on Slander*, 313, *note g, Ed.* 1852.    1 *Hare & W's Lead. Cases*, 138.

An innuendo is a mere explanatory averment, used in cases where it is doubtful of what matter or person the words are spoken.    It merely points out more clearly the defendant's allusion.    It means no more than *"id est,"* *"silicet,"* or *"meaning,"* or *"aforesaid,"* as explanatory of a matter sufficiently expressed before.    "It does not extend the sense of the words beyond their own meaning, but simply connects them with something already on record."    1 *Starkie on Slander*, 421, 422.    1 *Amer. Lead. Cases*, 138.

If an employee, having charge of the property of his employer, secretes or makes way with the same, or any part of it, he is guilty of larceny at common law.    See *Whar.*

*Amer. Crim. Law,* 2nd *Ed.,* 562. *Regina vs. Kelly,* 2 *Car. & Kir.,* 378. 61 *Eng. C. L. Rep.,* 378. *Gay vs. Homer,* 13 *Pick.,* 535.

The Act of 1820, ch. 162, sec. 2, provides that "if any servant, agent or clerk, or any person employed as such by any body corporate or public, shall, by virtue of such employment, receive or take into his possession any goods or effects for or on account of his employer, and shall fraudulently embezzle, secrete or make way with the same, or any part thereof, he shall be deemed guilty of having stolen such goods or effects."

Does not the *narr.,* in its first count, set forth an offence within the pale of this Act? Does it not state that the plaintiff was employed as the agent of the Rail Road Company at Locust Point, and that as such agent, *i. e.,* by virtue of such employment, he was entrusted with the care and custody of the wood? In regard to the words themselves, the rule of construction is to construe them in their plain and popular sense, such in which the ordinary hearer would have construed them at the time they were spoken. *Roberts vs. Camden,* 9 *East.,* 93. *Sturt vs. Bragg,* 59 *E. C. L.,* 10 *Q. B.,* 905. "Where, from the general import of the words, they appear to have been spoken with a view to defame, the Court ought not to put a construction upon them different from what they bear in common acceptation." 1 *Stark. on Slander,* 430. 2 *Id.,* 100. *Peake vs. Oldham,* 1 *Cowp.,* 277. *Woolworth vs. Meadows,* 5 *East.,* 463. See also, *Morgan vs. Livingston,* 2 *Rich. L. R.,* 573.

And so in the present case, the offence is complete on the *colloquium,* and the words themselves as applied to the subject matter of the *colloquium;* an innuendo could not enlarge the words, or extend their meaning, if not already shown to be actionable by the *colloquium* and the words themselves. 1 *Stark. on Slander,* 421, 422, 429. *Sheely*

56    v.19

*vs. Biggs,* 2 *H. & J.,* 364. *Jones vs. Hungerford,* 4 *G. & J.,* 402. *Dorsey vs. Whipps,* 8 *Gill,* 462.

If the *narr.* is good without the innuendo, it may be rejected as surplussage; if it is not good without it, the innuendo cannot make it so. *Commonwealth vs. Snelling,* 15 *Pick.,* 335. *Amer. Lead. Cases,* 137, 138.

If the words are considered ambiguous or equivocal, the objection might have been taken advantage of on demurrer, but not in a motion in arrest. It is a rule in evidence, that if the meaning of words be equivocal, they shall be taken strongly against the pleader. But after verdict, the ambiguity is cured either in the declaration or replication, and must be construed in that sense which will sustain the verdict. 1 *Chitty on Pleading,* 216. *Charlotte Hall vs. Greenwell,* 4 *G. & J.,* 418. *Avery vs. Hoole, Cowp.,* 826. See also, particularly, 1 *Stark. on Slander,* 47, 53, 63, &c.

The words connected with the circumstances and prior situation of the plaintiff, as agent of the Baltimore and Ohio Rail Road Company, having custody of its wood at Locust Point, present clearly a good cause of action, and if there is any error, it is an imperfection arising from defective statement of a good title, and is cured by verdict. Act of 1856, ch. 112, sec. 43. 2 *Tidd's Practice,* 919. *Williams' Saunders,* 228. *Dobson vs. Campbell,* 1 *Sumner,* 326.

Besides, independently of the foregoing argument, the *narr.* is good under the Act of 1856, ch. 112. In Art. IV, relating to pleadings in general, it is stated, sec. 52, p. 151, that "whatever facts are necessary to constitute the ground of action, shall be stated, and nothing more." And in sec. 64, "the form of the pleading shall in no case whatever control its substance." And where the words and matter set forth, with or without the alleged meaning,

show a cause of action, the declaration shall be sufficient. Act of 1856, ch. 112, sec. 73.

The cases where a contrary doctrine has apparently been held, upon examination appear to be cases where the *narr.* was defective through want of a proper *colloquium*, setting forth the peculiar circumstances and matter connected with or in reference to which the words would have been actionable. See 1 *Starkie on Slander*, 392. *Sheely vs. Biggs*, 2 *H. & J.*, 364. *House vs. House*, 5 *H. & J.*, 126. *Jones vs. Hungerford*, 4 *G. & J.*, 406.

"Courts will and should be cautious how they arrest judgments after verdict. They should intend nothing to overturn them. Nor ought we to be astute to defeat rights, when the law makes it our duty to defend them." *Charlotte Hall School vs. Greenwell*, 4 *G. & J.*, 418. *Peake vs. Oldham*, 1 *Cowper*, 277, 278. Act of 1809, ch. 153, sec. 2.

The argument submitted on the first count, applies also to the second. The *innuendo* in one count may be supported by a *colloquium* in a previous one, and though the last set of words be not in themselves actionable, they shall have relation to the former set. 1 *Starkie*, 430. *Tindal vs. Moore*, 2 *Wils.*, 114. *Amer. Lead. Cases*, 144. *Hughes vs. Reese*, 4 *Mees. & Wels.*, 206. *Nestle vs. Van Slyck*, 2 *Hill*, 282.

The *innuendo* in the second count (meaning thereby that the wood belonging to the said Company at Locust Point had been dishonestly appropriated) was unnecessary, the slanderous meaning being apparent without it, and may be subjected as surplussage. 1 *Stark.*, 392, 393. *Amer. Lead. Cases*, 142. *Commonwealth vs. Snelling*, 15 *Pick.*, 321, 335. And under the statute laws of this State, judgment will not be arrested or reversed for any defect in any count of the declaration, if there be one good one. Act of 1809, ch. 153, sec. 2. *Terry vs. Bright*, 4 *Md. Rep.*, 434.

Whether the amendments were properly made without

requiring a juror to be withdrawn, and the jury to be re-sworn, depends upon the construction of our Acts of Assembly of 1785, ch. 80, 1809, ch. 153, and 1852, ch. 177. The only substantial difference between the Act of 1809 and that of 1785, consists in the insertion in the former of the following words: "But the case shall not be continued to the next term, unless the Court shall be satisfied that the same is necessary." *Ev. Pr.*, 245, 246.

The Act of 1852, ch. 177, has two sections bearing upon this question, the first and ninth. While modifying by its first section the Act of 1809, its ninth section is evidently designed to promote a speedy trial, and to dispense with unnecessary forms and technicalities; and to this end provides, in all cases where the ends of justice do not require a continuance, that the cause, notwithstanding an amendment has been made, *shall proceed as if no such amendment had been made.* If the cause is to proceed as if no amendment had been made, upon what grounds can it be contended that a juror must be withdrawn, and the jury resworn. This is precisely what was done prior to the Act of 1852, where amendments *were made.* (See 1 *Kent's Com.*, 467, *note d.*) The Act of 1852 does not cover the whole subject of amendments, and as it does not in terms repeal the Act of 1809, it can be considered as doing so by implication only so far as they are plainly repugnant to one another. *Dugan vs. Gittings*, 3 *Gill*, 154. *Dwarris on Stat.*, 675. These Acts should be read as they are collated in the Code. Art. 75, secs. 23, 24 and 32.

It seems to us clear, in the present case, that the ends of justice did not require a juror to be withdrawn; there was manifestly no surprise or injury affected by the amendment; it was made at bar, and, as the appellee believed at the time, and now contends, with the assent of the appellant; at all events, no objection was made or taken, the case was discussed before the jury after the amendment by

both sides; and no application was made by defendant's counsel to re-swear the jury, but on the contrary, they agree that the amendment may be made at bar; and if the agreement does not in words express a waiver, it does, taken in connection with the whole conduct of the appellant, amount to an acquiescence in the amendment, which cannot now be withdrawn without operating a surprise on the Court and counsel. *Evans' Prac.*, 245. But if it were conceded that no amendment was in point of law made, then the original declaration, as in the case of *Lohrfink vs. Still*, remained unchanged; and the appellee contends that it was sufficient to support the judgment. If it contains any error, it is that of a good title defectively stated, which is cured by verdict. 2 *Tidd's Pr.*, 919, *Ed.* 1856, and *Gould Pl.*, *ch.* 10. 2 *Williams' Saunders*, 137, *b.* 1 *Barnwell & Cress.*, 297. *Evans' Pr.*, 330. Act of 1856, ch. 112, sec. 43.

The appellee, Dickerson, also contends, that the third exception was well taken: 1st. Because the instruction given by the Court to the jury, in granting the defendant's prayer, assumes that the communication was privileged, unless the jury should find that the words were spoken from express malice. 2nd. Because it defines express malice to be personal spite and ill-will on the part of the defendant towards the plaintiff. when proof of *mala fides* would be sufficient to establish express malice; that is to say, proof that the words were spoken without regard to the plaintiff's character, from hostility to some other person,—as hostility to Mr. Harrison, or his administration of the company's affairs,—and the Court erred in limiting express malice to personal spite and ill-will against the plaintiff. 2 *Starkie on Sl.*, 53, 56. 2 *Greenleaf Ev.*, secs. 468 and 422. 2 *Starkie's Ev.*, 464. *Brooks vs. Blanshard*, 1 *Cromp. & Mees.*, 779. *Patterson vs. Jones*, 3 *M. & Ry.*,

101. *Cook vs. Hill*, 3 *Sandf.*, 341. *Combs vs. Rose*, 8 *Blackf.*, 155.

In the event of an affirmance of the judgment as against the defendant on his appeal, the appellee, Dickerson, will abandon his exceptions. *Emory & Galt vs. Owings, &c.*, 3 *Md. Rep.*, 184, 190. *Boehme vs. Carr*, 3 *Md. Rep.*, 210. 9 *Gill*, 376.

COCHRAN, J., delivered the opinion of this Court:

This appeal was from a judgment obtained in a suit brought to recover damages for defamatory words spoken by the appellant of the appellee, at a meeting of the Board of Directors of the Baltimore & Ohio Rail Road Company, held on the 18th of March 1857.

It was admitted at the trial below, that the appellant was a sworn Director in that Company at the time the words declared on were spoken, and that these words were addressed to the President and other Directors of the Company; and further, that the appellee had been employed by the Company in the care of its wood at Locust Point, for some time previous to the 8th of January 1856, and that he was on that day discharged.

It also appears, that after swearing the jury, and before it retired to consider of the verdict, the appellee offered certain amendments to his declaration, which, by an agreement of the parties, were to be taken and considered as made at bar, by leave of the Court.

Exceptions were reserved on both sides, and after verdict, a motion for an arrest of judgment was filed by the appellant, and by his consent overruled *pro forma*.

We have concluded, from an examination of the case, that its determination depends on the questions presented by the motion in arrest, and the appellant's exception to the refusal of the instruction contained in his 1st prayer,

Garrett *vs.* Dickerson.

and shall therefore limit this opinion to an expression of our views on those questions.

The motion brings into review the formal proceedings in the case, upon the consideration of which we are to determine whether the alleged defects in the original and amended declaration are of such a character as to justify an arrest of the judgment. It was contended that the original declaration was insufficient, on the ground that the defamatory words, as laid in the several counts, did not with sufficient certainty impute to or charge the appellee with the commission of any criminal offence. The force of this objection was practically conceded by the attempt to remedy or remove it by the amendments offered during the trial, and agreed to, as made by leave of the Court. The verdict having been rendered on the amended and not on the original declaration, we think the objection does not arise on the pleadings as they are now actually presented, and that whatever effect it might have had before the amendments were made, it is not a material one in the present state of the case. On this motion we are to review the record, not as it was before the amendments were made, but as it stood at the rendition of the verdict, and from that point proceed to determine the character of the pleadings. In our opinion, the amended declaration discloses and presents a substantial cause of action. Although the defamatory words, as laid, may not show that a particular felony was charged with technical precision, yet we think that they do impute the commission of a particular offence, punishable as a crime either at common law, or by statute. In cases of slander, words take their actionable character from the sense in which they appear to have been used, and that in which they are most likely to be understood by those who hear them. The words declared on in this case, in their natural sense and import, constitute a slanderous charge, and as they are averred to have been spoken of and

concerning the appellee by the appellant, and that they were meant by him to impute to the appellee the commission of a specific offence, punishable as a crime, we think the declaration as amended was sufficient. But the objection was not made so much to the form of the amended pleadings, as to the mode and circumstances in and under which the amendments were made. It was contended, that making the amendments after the jury were sworn, without withdrawing a juror, changed the issues the jury were sworn to try, and that, as a consequence, the verdict rendered was without authority of law, and invalid. Whether this was the legal result of amending the declaration in the manner disclosed, depends on the construction of the agreement, and of the Acts of 1809, ch. 153, sec. 1, and 1852, ch. 177, secs. 1 and 9.

The Act of 1809, embracing substantially the provisions of the Act of 1785, ch. 80, sec. 4, vested the Court with power to order and allow any amendment in the proceedings before verdict, but not after swearing the jury, without withdrawing a juror; and it was contended that this last conditional provision was not repealed by the Act of 1852. If we were even to concede that clause of the Act of 1809 to be unaffected by the Act of 1852, still we think, upon a fair interpretation of the agreement, that the appellant is not entitled to make the objection relied on. The evident purpose of the agreement, was to waive a compliance with the formalities incident to amendments made by leave of the Court, and to bring the case upon the amended, instead of the original pleadings, before the jury then sworn. The plain import of its terms is, that the amendments proposed were to be considered as made in the case for the jury then empannelled, and as entering into and constituting, with the other proceedings, the actual record upon which the verdict of that jury was to be found. The Act of 1809 required the withdrawal of a juror as one of

the conditions or incidents of amending proceedings after swearing the jury, and construing the agreement with reference to the requirements of that Act, the parties to it would be considered as having obligated themselves, in the further progress of the trial, to assume that those requirements had been complied with. In that view, the effect of the agreement would be, to place the case on the amended pleadings before the same jury, and to estop the parties from objecting on that ground to their verdict. We think, however, that the Act of 1809 was so far modified by the Act of 1852, as to permit the amendments made in this case, without withdrawing a juror. The 1st section of the last named Act, authorizes the amendment of the proceedings, including the writ or summons, at any time before the jury retire to make up their verdict, and the 9th declares that no continuance shall be granted upon such amendments, and *"that the case shall proceed as if no amendment had been made,"* unless the Court is satisfied that a continuance is necessary to the ends of justice. These provisions are clear and intelligible, and, in our opinion, authorize amendments which do not change the substance of the issues, to be made after the jury are sworn, without withdrawing a juror. The clause directing "the case to proceed as if no amendment had been made," can have its full effect upon no other construction.

The amendments made in this case, did not change the issues joined, nor were they such as to deprive the appellant of any defence or right, and as the Court had the power to direct the case to be proceeded with, as if no amendment had been made, we think the objection to the verdict cannot be maintained. Having found, in our view of the record, no sufficient reason for arresting the judgment, the ruling of the Court below on the motion will be affirmed.

57      v.19

The instruction contained in the appellant's 1st prayer, which the Court rejected, presents two propositions: 1st, that the words laid in the declaration were privileged; and 2nd, that there was no evidence in the case from which the jury could find that they were spoken from malice in fact. The 1st of these propositions was granted by the Court in the appellant's 2nd prayer, which, for that reason, need not be considered, and the proposition that there was no evidence of express malice, alone remains to be determined.

The only effect of privilege on actionable words, is to rebut the legal inference or presumption of malice, and to that extent constitute a good defence in an action upon them. The question, whether words sufficient in themselves to raise the legal presumption of malice, are privileged, is one of law, determinable from the circumstances leading to and attending their utterance. It is to be observed that words ascertained to be privileged as matter of law, still involve the element or fact of good faith in speaking them, and that in general, evidence of any act or circumstance tending to show the want of good faith, may be offered to remove the protection of privilege, and show the existence of malice. And although the occasion may be such as to justify the legal inference of privilege, yet the jury may look to the words themselves, in connection with other facts and circumstances than those from which the privilege is deduced, in passing upon the question of express malice, and evidence of any other words or acts having reference to the subject matter of the actionable words, may be submitted to the jury for the same purpose, whether such other words or acts were spoken and done before or after suit brought. *Toogood vs. Spyring*, 1 *Crom. Mees. & Ros.*, 192. *Coxhead vs. Richards*, 52 *Eng. Com. L.*, 584. *Taylor vs. Hawkins*, 71 *Eng. Com. L.*, 307. *Wright vs. Woodgate*, 2 *Crom. Mees. & Ros.*, 573. *Gassett vs. Gilbert*,

6 *Gray*, 97. *White vs. Nichols*, 3 *How.*, 266. *Wallis vs. Mease*, 3 *Bin.*, 546. *Bodwell vs. Swan*, 3 *Pick.*, 376. *Kennedy vs. Gifford*, 19 *Wend.*, 296. *Duvall vs. Griffith*, 2 *H. & G.*, 30. Applying the principles enunciated upon the strength of these authorities, we think the instruction that there was no evidence proper for the jury to consider on the question of express malice, was properly refused. The conversation of the appellant with Mr. Latrobe, as stated by the witness Bollman, referred to the appellee, and in some degree indicated personal hostility on the part of the appellant. In that view we think it was evidence on the question of express malice, and that it was properly allowed to go to the jury.

*Judgment affirmed.*

(Decided March 25th, 1863.)