## GREENBELT COOPERATIVE PUBLISHING AS-SOCIATION, INC., ET AL. *v.* BRESLER

[No. 97, September Term, 1968.]

*Decided May 2, 1969.*

328

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, FINAN and SINGLEY, JJ.

*Roger A. Clark,* with whom were *Royall, Koegel, Rogers &
Wells* and *David Reich* on the brief, for appellants.

*Abraham Chasanow* for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves a judgment, entered upon the verdict of
a jury by the Circuit Court for Prince George's County (Math-
ias, J.) for $17,500 damages ($5,000 compensatory and $12,500
punitive) in favor of Charles S. Bresler, appellee and plaintiff
below, for libel, against the appellants and defendants below,
Greenbelt Cooperative Publishing Association, Inc. (Publish-
ing Association) publisher of the Greenbelt News Review
(News Review), and its president, Alfred M. Skolnik.

Inasmuch as the jury returned a verdict in favor of the plain-
tiff, Bresler, we must review the facts in the light most favor-
able to him, where those facts are in dispute or where more than
one inference may be drawn from them. *Campfield v. Crowther,*
252 Md. 88, 249 A. 2d 168 (1969) ; *Cassell v. Pfaifer,* 243 Md.
447, 453, 221 A. 2d 668, 671 (1966). Accordingly, we note that
there was sufficient evidence in the record from which the jury
could have found the following facts : The News Review is the
only newspaper published in the City of Greenbelt. Its circula-
tion consists of approximately 4,500 copies each week, of which
only about 75 are paid subscriptions which are mailed; the re-
maining copies are delivered without charge to every house in
Greenbelt. Mr. Skolnik is not only president of the Publish-
ing Association, but also writes many of its feature articles and
editorials. He is also one of the five members of the editorial
board which reviews and edits all of the material published. His
wife, Elaine Skolnik, writes many of the feature articles as well
as a weekly column and is one of several housewives who serve

as reporters. The Skolniks are well-educated persons, Mr. Skolnik holding three degrees, B.A., M.A. and Ph.D., and Mrs. Skolnik having attended college for three and one-half years.

The News Review published a number of articles and editorials concerning Mr. Bresler which are alleged to be false, malicious and libelous. The two principal articles which used the word "blackmail" with reference to Mr. Bresler related to the proposed zoning of two tracts of land (Parcels 1 and 2) in which he owned a 16⅔ per cent interest. Bresler and his associates had requested, and the Maryland National Capital Park and Planning Commission (MNCPPC) Master Plan had recommended R-30 (Townhouse) zoning for both tracts, but this zoning was vigorously opposed by Greenbelt Homes, Inc., the large mutual housing cooperative in Greenbelt, (GHI) and a group known as "Citizens for A Planned Greenbelt" (CFPG). CFPG had approximately 650 Greenbelt residents as members, and had no requirement for membership other than the payment of $1.00. Mrs. Skolnik is one of the twenty members of the Steering Committee of CFPG, which operates as its executive body. Both Mr. Skolnik and his wife, Elaine, attended meetings of the Steering Committee.

The Skolniks are also members of GHI by reason of having purchased the perpetual use of one of the original Greenbelt row houses. GHI at one time owned all of the land now owned by Bresler and his associates, but sold it at a profit instead of developing it. GHI owns the wooden row houses which sell for between $5,000 and $10,000 and which are located in front of Parcels 1 and 2. It opposed the R-30 zoning for Parcels 1 and 2, even though it was building townhouses on its own property. It advertises regularly in the News Review. Charles Schwan is president of GHI and is a friend of the Skolniks. He serves with Mrs. Skolnik on the CFPG Steering Committee and is chairman of the CFPG Membership Committee.

The evidence at the trial, which began on January 3, 1968, indicated that in 1961 and 1962 the relations between Bresler and the City Council of Greenbelt were cordial. A rather glowing article appeared in The Washington Post of October 6, 1962, by John B. Willmann, its Real Estate Editor, under the headline "Vast Private Developments Planned In 25-Year-Old Green-

belt Community", in which the proposed activities of Mr. Bres-
ler as a developer are set out in some detail. It was indicated that
he had acquired 450 acres of land in Greenbelt for nearly
$2,000,000, and with a partner was beginning the first group of
61 homes. The total planning and zoning, however, which had
been worked out with the Greenbelt officials, called for some 800
single-family dwellings and 350 townhouses in the areas north
and south of Greenbelt. "Two years ago," the article stated,
Mr. Bresler had "built and then sold, the 87-unit Greenbelt
Apartments—a three-quarter-million-dollar project." The ar-
ticle stated:

> "There are now nearly 2000 row house and apart-
> ment living units in Greenbelt and more than a hun-
> dred residents are 'plank owners' in the community
> that was called Tugwelltown when it was conceived
> as a New Deal experiment. More than 8000 persons
> live in Greenbelt today and nearly that many more
> would be added over the next several years by the de-
> velopments planned by Bresler.
>
> "Meanwhile, Greenbelt will also grow with the de-
> velopment of Springhill Lake, a Community Build-
> ers' project on a 390-acre tract in the northwest sec-
> tion of the town. Ground was broken this summer for a
> planned community that eventually will be a $50-mil-
> lion development of town houses and high-and-low
> rise apartments totaling some 5000 living units."

In 1964, however, the relations apparently had become some-
what strained inasmuch as in the News Review of May 7, 1964,
in an article written by Mr. Skolnik reporting what had hap-
pened at the meeting of the City Council of Greenbelt on May
5, it was stated that Councilman Simonson "also observed that
much debris had been left along the shoreline, including a spread-
ing patch of tar-oil, as the result of the construction of Lake-
side Extended by the developer Charles Bresler." Further dis-
cussion was then reported and the article continued:

> "It took the better part of two hours before the
> council and the audience decided that it made much
> more sense to stop attacking each other and concen-

trate on a common target—Bresler—who wasn't there. The council rapidly agreed, with the full approval of a tired audience, to get off a letter to Bresler notifying him that unless all material and debris now encroaching upon city land is removed within a specified time, the city will remove the debris at the developer's expense. Councilman Dave Champion dissented on the grounds that the city has already received assurances from Bresler that this would be done. The council and audience remained skeptical."

On June 2, 1964, Mr. and Mrs. Bresler and the Suburban Trust Company, mortgagee, executed and recorded among the land records of Prince George's County, a release of covenants previously entered into with the City of Greenbelt in 1962. These covenants allegedly placed on the 50 acre Charlestowne Village Terrace a limitation of the density to 7 units an acre.

By April 22, 1965, as reported in the News Review of that date, an active campaign was in progress for membership in CFPG, the principal goal of which was " 'to preserve the fundamental character of Greenbelt as a low-density, planned residential community.' " In an article by Mr. Skolnik in the same issue bearing the headline "CITY BATTLES BRESLER ON 2 FRONTS; SETS SPRING CLEAN-UP FOR MAY 3-17", it was stated that: "Another confrontation is looming between the city council and the local developer, Charles Bresler and associates." The article recites that a subdivision plat for section 2 of Charlestowne Village was filed with MNCPPC calling for 260 units "in excess of the number agreed upon in the covenant entered into between the city and Bresler at the time the land was rezoned." The article further stated the MNCPPC had approved the subdivision plat as it only looked to the zoning of the land and "does not take into consideration private agreements between municipalities and developers." It was further stated that the "city and Bresler will also be at odds this week when the suit filed by the city against Ivy Homes, Inc. and Boxwood Village, Inc. comes before the circuit court," involving an alleged excess of rain water resulting from the rough

grading of the land. The article continued: "Further disillusionment of the community with the developer was seen at the council meeting when new residents of Lakeside Extended complained that the developer was not removing unsightly debris accumulated from building operations."

We now come to the two articles in the News Review which form the principal basis for the libel action.

In the News Review of October 14, 1965, the first article containing the following relevant portions appeared:

### "SCHOOL SITE STIRS UP COUNCIL REZONING DEAL OFFER DEBATED

by Dorothy Sucher

"Delay in construction of a new Greenbelt high school is the lever by which a local developer is pressuring the city to endorse his bid for higher density rezoning of two large tracts of land; so citizens heard at a well-attended special meeting of the City Council on Monday night, Oct. 11.

"For the past nine months, the Board of Education has been trying to acquire land owned by Consolidated Syndicates, Inc. (Charles Bresler—Theodore Lerner), for a high school site. * * *

  * * *

"Some time ago, it became known that the developer would agree on the price, provided the city would help him obtain higher density rezoning for two of his tracts (Parcels 1 and 2, totaling 230 acres) near the center of Greenbelt. If the city refused, he threatened to delay the school site acquisition as long as possible through the courts.

  * * *

#### "Blackmail

" 'It seems that this is a slight case of blackmail,' commented Mrs. Marjorie Bergemann on Monday night, and the word was echoed by many speakers from the audience.

"Councilman David Champion, however, denied that it was 'blackmail,' explaining that he would rather 're-

fer to it (i.e., the negotiations-Ed.) as a two-way street.'

"Speaking from the floor, Gerald Gough, commented: 'Everyone knows there's a need for a school —just walk through the halls of High Point. The developer knows there's a need and says, 'we'll meet your need if you meet our need.' In my opinion, it's highly unethical.

\* \* \*

"Delay Probable

"Mayor Edgar Smith remarked that it should be made clear that refusing the developer's terms did not necessarily mean the loss of the school site; that it would, however, probably mean a two or three year delay in the construction of the school.

\* \* \*

"Among the parents who spoke was Mrs. Joseph Rosetti, who said: 'I have several children going into high school, but I would rather adhere to the Greenbelt Master Plan than overcrowd the town with dense development. I would stand for my children's discomfort, rather than give in to a blackmailing scheme.'

\* \* \*

"Councilman William Hoff asked whether the City Council itself knew all the facts about the transactions with the Board of Education and said: 'We weren't ever informed about the money transactions between the developer and the school board.' "

In the same issue of October 14, a letter to the editor from Miriam and Howard Laster was published. This letter to the editor was entitled, "An Unethical Trade" and stated, in relevant part, the following:

"We have been following with great concern the county's attempt to build a high school in Greenbelt. As parents of a junior high school daughter, as well as three other children who eventually will attend secondary school, we are eager to see an excellent high school construction quickly in our city. However, we

resent the way in which our needs are being exploited cynically by the land developer who owns the property on which the school is scheduled to be built.

\* \* \*

"We do not envy the council its difficult choice. However, we believe strongly that it is a choice the council never should have been asked to make. The two issues should not be confused, and the Board of Education should have rejected the developer's attempt to tie them together. Since it did not, we request that the council reject this unethical trade.

\* \* \*

"While we never should have been forced to make such a choice, we believe that ethical and practical considerations both argue against agreeing to the developer's demands. We hope that other Greenbelt residents will join in indicating this at the next city council meeting Monday."

The second article appeared in the News Review of October 21, 1965, and contained, in relevant part, the following:

## "COUNCIL REJECTS BY 4-1 HIGH SCHOOL SITE DEAL

### by Mary Lou Williamson

"More than 150 citizens came to hear how the new City Council would respond to pressure by a local developer for higher density zoning on a large tract of land in exchange for uncontested consummation of the sale of a Greenbelt senior high school site to the Board of Education at the Council meeting Monday night.

"Council sat quietly listening for more than an hour to citizen statements before voting to reject the proposal (4-1) with Councilman Dave Champion dissenting. \* \* \*

\* \* \*

"A procession of citizens took the floor to make impassioned speeches—some from prepared texts, some extemporaneously. The mayor occasionally had to caution them to refrain from engaging in personalities.

"Albert Herling suggested skulduggery in the September court postponement. Although he praised most of the City Manager's report, he criticized the section entitled 'Risks and Conclusions,' saying they appeared negative in the extreme. He suggested a list of positive steps that council ought to take: 1) fight Bresler's 'blackmail'; 2) make clear to the Board of Education —no deals; 3) make clear to the District Council (zoning authority) unanimous opposition to the requested R-30 zoning; and 4) seek the swiftest possible court settlement. * * *

*  *  *

"Pilski asked if anyone in the audience cared to speak in support of Bresler's proposal.

"Only James Martin took the floor. He suggested that Bresler's action was not 'blackmail' but the legitimate advance of his rights to develop his land, Martin suggested, by way of example, that GHI's long-range planning committee had been doing much the same thing some months ago. He alleged that the density of the 'frame homes (GHI) is far more atrocious than anything Bresler's considering."

Also in the October 21 issue, an editorial appeared entitled, "THE LIMITS OF COMPROMISE" in which it was stated:

"But some of the developers are not satisfied with half a loaf; they want the whole loaf, and in a few instances, do not seem to care what methods are used to achieve their goal."

In the January 20, 1966 issue of the News Review, a letter to the editor from Clifford Simonson, entitled, "ANOTHER CRIPPLING BLOW" was published. It stated in relevant part:

"On January 11 the county board of education and the developer Charles Bresler struck another crippling blow at Greenbelt's Master Plan. Bresler, in flagrant disregard of that plan and the wishes of nearly all Greenbelt citizens, moved to compound even fur-

ther the serious problems which a senior high school in his land-locked property on parcel 2 would create."

After stating why the new school location was undesirable, Mr. Simonson continued:

"Chairman W. Carroll Beatty of the school board never did answer Elaine Skolnik's question as to whether the board had fully calculated all costs associated with developing the respective school sites. Board member Thomas Hicks never did answer questions as to how the elimination of a perimeter road would affect the core of Greenbelt. The evasive answers can only lead one to the conclusion that such vital aspects were never really considered.

"Must we cannibalize original Greenbelt to spawn unwieldy, unplanned, and unwanted development, solely for the convenience and profit of the developer?"

In the issue of April 7, 1966, the News Review published an article by Mrs. Skolnik under the headline: "BRESLER REPUDIATES COVENANT SIGNED WITH CITY IN 1962", in which it was indicated that news of the Release of Covenants filed for record on June 2, 1964 "came as a complete surprise to city officials since Bresler had not at any time during the past 22 months notified the city that he had unilaterally abolished the covenant agreement." and that "The city is now looking into the legality of the 'Release of Covenants' filed by Bresler since it was not a party to the document."

A letter to the editor from Mrs. E. S. Ross was published in the News Review of May 19, 1966, which was as follows:

"I wonder if the rest of Greenbelt's residents were as startled as I was to read in Sunday's Washington papers of Spiro T. Agnew's invitation to Charles Bresler to run as the Republicans candidate for State Comptroller?

"The article in the Star made mention of Mr. Bresler's recent land dealings for the State. I wonder how much is known of his land dealings against this city?"

The News Review, in its issue of June 9, 1966, under the

headline, "CHARLES BRESLER TO RUN FOR STATE COMPTROLLER" published an article indicating that Mr. Bresler expected to announce his candidacy for Maryland State Comptroller on the Republican Ticket on Saturday, June 11. The article then stated in relevant part:

> "Bresler, a real estate developer and builder, owns most of the remaining vacant land in Greenbelt. He developed the Plaza Apartments, Lakecrest Homes and Charlestowne Village, and was the original developer of Boxwood Village.
>
> "Bresler is currently faced with a series of legal actions instituted by the City of Greenbelt. * * *
>
> * * *
>
> "Reportedly, a number of homeowners, both in the Lakecrest and Boxwood developments, have started legal proceedings against Bresler for failure to make construction corrections in accordance with county standards."

It should be observed that until the letter to the editor in the News Review issue of May 19, 1966, and in the issue of June 9, 1966, there had been no mention of any kind in any News Review issue offered in evidence which referred to Mr. Bresler as holding or seeking any public office of any kind or of his fitness or lack of fitness for such an office, although Mr. Bresler was a member of the Maryland House of Delegates from Montgomery County (and not from Prince George's County where the City of Greenbelt is located), and there was no reference to any act of Assembly or other political activity by Mr. Bresler which might possibly affect the City of Greenbelt, its inhabitants or Prince George's County generally. All of the references were to Mr. Bresler as a land owner and developer.

Finally, on June 30, 1966, the News Review published an article under the headline "GHI FILES SUIT AGAINST SCHOOL BOARD; BRESLER INFLUENCE CITED" which stated in relevant part:

> "The bill of complaint for injunction, filed by GHI's special attorney, David Reich, stated that in reversing

its decision to buy parcel 15 (the city-preferred Belt-way-Lake site), the school board was influenced by considerations other than the public interest and by the pressures and influence which the developers (Charles Bresler, Theodore Lerner, and associates) were able to assert by reason of their ownership of both sites (parcels 2 and 15).

\* \* \*

"The chairman of the county school board is W. Carroll Beatty, who is a director of the Suburban Trust Company which has held the mortgages on much of Bresler's properties in Greenbelt. The county school board attorney is Paul Nussbaum, who is on the Suburban Trust Company's Advisory Committee."

The present action for damages for libel was filed on July 18, 1966, and an amended declaration was filed on November 7, 1966. The plaintiff, Mr. Bresler, claimed in the *ad damnum* clause, $1,000,000 compensatory damages and $1,000,000 exemplary or punitive damages. He alleged that in the publications mentioned in the amended declaration, the defendants, Publishing Association and Mr. Skolnik—

"[F]alsely and with express malice printed [the charges of blackmail] \* \* \* for the purpose of imputing to the Plaintiff the commission of the crime of blackmail; and for the purpose of exposing the Plaintiff to public scorn, hatred, contempt, disgrace and ridicule; and for the purpose of injuring the Plaintiff in his aforesaid business and occupation; and to degrade Plaintiff in the esteem or opinion of the residents of the City of Greenbelt and the State of Maryland and elsewhere; and to infer and imply that Plaintiff is untrustworthy; and to injure Plaintiff in his credit and financial transactions; and to infer and impute to Plaintiff corrupt or dishonest motives in his dealings with City, County and State officials and others; and to impute to Plaintiff moral turpitude, immoral conduct, dishonesty, fraud and falsehood.

"The aforesaid publications were intended to and

did injure the Plaintiff as follows: They did injure the Plaintiff in his business and occupation, and did injure Plaintiff in his business reputation and practice, and did injure Plaintiff in his financial credit and transactions, and did expose the Plaintiff to public scorn, hatred, contempt, disgrace and ridicule, and did degrade Plaintiff in the esteem or opinion of the residents of the City of Greenbelt and the State of Maryland and elsewhere.

"Said publications were made recklessly and without reasonable justification or excuse, and were printed and published in said newspaper by and with the knowledge and consent of each of said Defendants and said Defendant, Alfred M. Skolnik, personally directed, supervised, assisted, and actively participated in, and cooperated in, the preparation, writing, editing, printing and publication of, the publications aforesaid."

The plaintiff did not elect a jury trial.

The defendants, in addition to the general issue plea that they did not commit the wrongs alleged, filed six other "defenses" challenging the sufficiency of the declaration to state a cause of action, and alleging that the publications were constitutionally protected under the First Amendment to the Federal Constitution and under Article 43 [40] of the Declaration of Rights of the Maryland Constitution; that the words were fair comment and were published without actual malice, and are privileged; and, that the words were published in good faith, without malice and with reasonable and probable cause. There was, however, no plea in justification of the truth of the alleged libelous words. The defendants elected a jury trial.

At the trial of the case, which began on January 3, 1968, before Judge Mathias and a jury, the plaintiff called the defendant, Mr. Skolnik, as an adverse witness. After testifying to many of the facts already given concerning the operations of News Review, his education and position and duties with the News Review, as well as his and Mrs. Skolnik's connections with CFPG and GHI, Mr. Skolnik was interrogated in regard to the article in the News Review issue of October 14, 1965, in

which the word 'blackmail" was used. He testified that he knew "blackmail is somewhat in the category of a crime." He said that he did not know who had inserted the bold-face subheading "BLACKMAIL," and stated that "It probably struck them, put in the word "blackmail", and further that "All we were doing was reporting what was said there and also what someone else said that it wasn't blackmail." When asked about Mrs. Marjorie Bergemann, who was quoted in the article of October 14 as using the phrase "a slight case of blackmail," Mr. Skolnik testified that Mrs. Bergemann was elected a member of the Steering Committee of CFPG six months after the article was published and that she was a friend of his.[1] Mr. Skolnik also identified Gerald Gough who was quoted in the article as using the phrase "highly unethical" as a member of GHI and CFPG. Mrs. Joseph Rosetti, who was quoted in the article as using the phrase "blackmailing scheme", was identified by Mr. Skolnik as a member of CFPG and also as a current member of its Steering Committee as well as a friend of his.[2]

Albert Herling, mentioned in the article in the News Review issue of October 21, 1965, as having "suggested" that the city council "fight Bresler's blackmail" was identified by Mr. Skolnik as both a member of GHI and of the Steering Committee of CFPG at the time the article was published. Albert Herling was mentioned in the October 21 article as having used the word "skulduggery". Mr. Skolnik testified that this "is the word that the reporter used to interpret what Mr. Herling was saying" and that the word skulduggery "means something amiss, something improper perhaps."

Mr. Skolnik admitted in his testimony that he had written parts of the editorial in the News Review issue of October 21 in which it was stated that some developers "do not seem to

---

1. Mrs. Dorothy Sucher, a witness for the defendants, who wrote the article, subsequently testified that Mrs. Bergemann was a neighbor and a "friendly acquaintance", who had requested that Mrs. Bergemann contribute to the CFPG legal fund which was used to file an action for damages against Mr. Bresler.

2. Mrs. Rosetti was also one of the unsuccessful plaintiffs in the damage actions brought against Bresler with the CFPG legal fund.

care what methods are used to achieve their goal" and that he was referring to Mr. Bresler and his associates.

Mr. Skolnik was referred to the News Review issue of June 9, 1966, which attributed to The Evening Star a report that Mr. Bresler intended to announce his candidacy for Maryland State Comptroller, and which related at length legal proceedings in which Mr. Bresler was involved, including a suit by the city in regard to drainage problems in Boxwood Village. Mr. Skolnik admitted that this suit was against two corporations, one of which Bresler had no interest in, and not against Bresler personally, and that the News Review failed to report that the case was dismissed as to Boxwood Village and later settled with the other corporation in which Bresler had no interest. The article further stated:

"Reportedly a number of homeowners, both in the Lakecrest and Boxwood developments, have started legal proceedings against Bresler for failure to make construction corrections in accordance with county standards."

Mr. Skolnik stated that this article had been written jointly by him and his wife, but that Mrs. Skolnik had written the above paragraph. He further stated that his wife had attended a CFPG meeting at which approximately 15 to 20 homeowners from Boxwood Village desired to air their complaints, but the chairman of the meeting said that they would not discuss the complaints, so that Mrs. Skolnik talked to them after the meeting adjourned. When asked what suits had been filed, Mr. Skolnik testified: "No, I don't know anything about suits. All I know is that people were complaining about the fact that they were having troubles." He stated that he thought "[L]egal proceedings include complaints."

Mr. Skolnik was questioned about an article in the June 16, 1966 issue of the News Review entitled, "CFPG DRIVE LAUNCHED" in which the "collection of funds earmarked specifically for legal fees" by the Steering Committee of CFPG was publicized. In the article it was stated that "Citizens suits are now being prepared in connection with an eight-story high rise apartment on Charlestowne-Village acreage and other ac-

tions of developers which are contrary to the Greenbelt Master Plan."

When interrogated in regard to whether or not Mrs. Skolnik assisted in any way in the collection of those legal funds, Mr. Skolnik answered, "I don't recall any activity in that respect", and affirmatively stated, "I don't think she had anything or much to do with the drive for legal fees", but when shown the last paragraph of an article in the News Review which solicited assistance and listed three telephone numbers to call, he stated that the last number was his wife's telephone number and that he and Mrs. Skolnik did not have separate telephones.

Mr. Skolnik stated that this suit arose out of a suggestion by Mayor Smith that the City's suit for an injunction against the violation of the covenants be supplemented by private suits, in the event that it was determined that the City had no standing to maintain its suit. Mayor Smith was a member of the Steering Committee of CFPG at that time, and was chairman of its Official Liaison Committee. Mr. Skolnik also testified that the contemplated suit was to be a suit in equity for an injunction and for no other purpose. When asked about an article in the July 7, 1966 issue of the News Review, entitled "CFPG DRIVE UNDERWAY", which stated that the legal funds were "to support legal action to maintain the garden-city character of Greenbelt and to help realize the City's Master Plan", Mr. Skolnik stated that one of the two telephone numbers given for those willing to assist to call, was the telephone number of Mrs. Skolnik.

In neither the News Review article in the June 16, 1966 issue, nor in the article in the issue of July 7, 1966 was there any mention of the fact that the suits were against any one except Mr. Bresler or for any purpose other than the stated purpose, i.e., to supplement the injunction suit of the City. Mr. Skolnik on further examination, however, admitted that the suit which was instituted was one *at law* in which each plaintiff, including Mrs. Rosetti, claimed $175,000 compensatory and punitive damages, together with an injunction pursuant to Maryland Rule BF 40 a.[3]

---

3. It was stated at the argument, as well as in Mr. Bresler's brief

Mr. Skolnik further testified that he did not know of any support by CFPG of suits against any developers other than Bresler who were developing in Greenbelt contrary to the City's Master Plan. He stated that GHI, which had opposed MNC-PPC's recommendations for R-30 (townhouse) zoning on Parcels 1 and 2, is, itself, building 25 townhouses on its own land.

Mr. Skolnik was asked: "Q. Have you ever instructed any of the members of your staff to call Mr. Bresler to verify any article which concerned him? A. No, we have no general—what we have is a general rule, that if you don't know the facts, if there is confusion about the facts, you call the principals involved." When asked if on any occasion there had been doubts to the facts where he had felt that is was necessary that he or the reporters communicate with Mr. Bresler, Mr. Skolnik was able to recall two instances, one "a few months ago" in regard to a report that Bresler was removing the trees on land owned by him directly across from a new project he had built and the other in regard to a newspaper report in the Washington press that a high-rise apartment project was to be built on Parcel 15. Mr. Bresler gave them the correct facts on these two occasions.

Mr. Bresler, himself, was the next and final witness for the plaintiff. In response to questions as to whether he owned "the bulk of the undeveloped land in Greenbelt," he testified that he had an interest varying from $16\frac{2}{3}$ to 25 per cent in several parcels of land in Greenbelt, which totaled 430 acres, whereas, other developers owned approximately 2000 acres. Zoning petitions had been filed for approximately 600 acres of land, he having an interest in such petitions for about 230 or 340 acres. Mr. Bresler further testified that no suit had been filed against him for any alleged failure to make construction corrections as required by the County holding standards.

He also stated that "the only personal suit I have had in Greenbelt is the one the City filed against me at the instigation

---

without contradiction that this law suit was tried after the present case and that four of the plaintiffs withdrew from the case before and during trial. The Circuit Court granted a motion for a directed verdict against the remaining plaintiffs and a judgment for costs entered upon the directed verdict has not been appealed.

of the News Review and G.H.I." He denied he was a blackmailer or that he had attempted to blackmail the City Council or the Board of Education or any one in connection with any of his projects or developments.

Mr. Bresler further testified that he had tried but could not obtain a subscription to the News Review. He tried to buy the paper but could not find any place to purchase the News Review. His office had telephoned for a mail subscription and "was told they didn't mail them out." He was surprised to hear Mr. Skolnik's testimony that the News Review has "50 to 75 people who receive mail subscriptions." When derogatory articles appear in the News Review, however, some person who receives the paper will mail one "to the Breslers. My wife opens it and one of my six kids will get up then and want to know what it is all about * * *. And the local residents call referring to the Bresler news because invariably two or three articles are on the front page mentioning me by name and allude to my name — as one of them said, if it wasn't for me there wouldn't be any paper."

On cross-examination, Mr. Bresler testified that he had signed the covenants in regard to building townhouses averaging 7 units an acre for 50 acres because "this was what they were going to do with everybody, that they were going to get the same covenants from everybody." [4] He said that he had in fact erected 144 townhouses, but the City had approved 12 units an acre for another developer, Lakeside North, a few months after the covenants "to assure no density larger than seven units per acre" had been required from him. He also stated that the developer of Lakeside North had agreed to build "townhouses, not garden apartments in that development," but did not "keep his word either" but the City took no action against that developer.

At the end of the plaintiff's case, the defendants made a

---

4. Lewis Bernstein, a former City Planning Board Chairman and member of the Greenbelt City Council, who testified as a witness for the appellants confirmed Mr. Bresler's testimony in this regard when he admitted that it was his intention that Bresler "would be afforded no more or no less, no worse or no better treatment than any other developer in the City of Greenbelt."

motion for a directed verdict which was denied by the trial judge. The defendants then put on their case.

The first witness for the defendants was the mayor of Greenbelt, Edgar L. Smith. He testified that he was in his third term as mayor, having been prior to his election as mayor, a member of the City Council of Greenbelt (from 1959-61). He had been city attorney for the municipality for about six months. He stated that he had been present at the meetings of the City Council on October 11 and October 18, 1965, and that the articles in the issues of October 14 and October 21 represented "fair and accurate" reports of the respective meetings.

On cross-examination, Mayor Smith stated that the date on which the City of Greenbelt first learned that Bresler intended to build a high-rise apartment was January 17, 1966, but the City Manager's Report for the week ending *October 22, 1965,* (a copy of which Mayor Smith assumed he received, as he normally does) indicated that Bresler was to construct a "High Rise 183 units", that the units "To be constructed" were in excess of the covenants and that "Mr. Brooks [city attorney] has been requested to prepare to take action to enforce the covenants." He testified that he did not think that either he or the City Council ever voted against any of CFPG's recommendations, and that he did not take issue with an article in the News Review which said that he went to meetings of the County Commissioners as a delegate from CFPG, and stated that he "didn't tell them I was Mayor, because I was there in a dual capacity. As Mayor, as delegate from CFPG." He also testified in regard to several committees set up by the Steering Committee of CFPG and that he was Chairman of the Official Liaison Committee as well as a member of the Steering Committee. Charles Schwan was Chairman of the Membership Committee and Albert Herling [5] was Chairman of the Public Relations Committee. Mayor Smith further testified that he was present and heard the entire discussions and that there was nothing that was discussed at either the meeting of the City Council of

---

5. In the article in the News Review of October 21, 1965, Mr. Herling is reported as having "suggested skulduggery in the September court postponement" and that the council should take steps to "fight Bresler's 'blackmail.'"

October 11 or October 18 which would "justify the use of the word 'blackmail.' " He further stated:

> "If there was any evidence that there was black-mail, any definite evidence of anything like this, the Council would have taken some action.
>
> "Q. You, as Mayor, would have told your Police Department to do something, wouldn't you?
>
> "A. Yes, we would have gone further than that, the State's Attorney's office probably."

Mary Louise Miller Williamson testified for the defendants that she had written the article in the issue of the News Review of October 21, 1965, which referred to Mr. Herling's alleged allegation of "blackmail" and "skulduggery." On cross-examination, she stated, "I paraphrased his sentence but I selected out the word 'blackmail' was his word and I wanted to denote it was his word I was picking up * * *." As to the word "skulduggery" attributed to Mr. Herling, she stated:

> "I did not use that word. This is a good example of what happens on Tuesday night when the other members of the Editorial Board will read through an article. Apparently it was an effort to shorten. This was quite a long article and this is somebody else's phrase. That I do recall."

She further stated that the $5 contribution she made to the legal fund of CFPG was to be used to "preserve the Master Plan of Greenbelt." She was not told, however, that this fund would be used to sue Mr. Bresler for damages in excess of a million dollars. She assumed that Mrs. Skolnik was soliciting for these funds, inasmuch as she was on the Steering Committee. When asked whether there was "anything in the discussion * * * which justified the use of the word 'blackmail' ", Mrs. Williamson replied: "There is no connection as far as I can see between what Mr. Bresler, what the situation—the offer, there is no relation between that and a crime of blackmail. There is a difference."

Dorothy Sucher testified on behalf of the defendants that she had written the article in the issue of the News Review of Oc-

tober 14, 1965, which first used the word "blackmail". She edited the second article in the issue of October 21, 1965, written by Mrs. Williamson and stated that the use of the word "skulduggery" was her idea. She is a member of CFPG and believed that she had contributed $1 to its legal fund drive. She stated that her article was not intended to be a complete quotation of everything that was said at the meeting and that she had not used all of her notes in writing the story. She testified that she "knew blackmail was a crime." She recalled that Mrs. Skolnik participated in the discussion at the meeting but could not remember if Mrs. Skolnik had used the word "blackmail", but she could not say she had not used it. She knew that she did not quote her. She had quoted Mrs. Bergemann, however, who used the word "blackmail" and Mrs. Bergemann had requested that she contribute to the legal fund of CFPG. She did not know that this legal fund was to be used to try to collect damages from Mr. Bresler. She testified that she thought that she had inserted the subheading "blackmail" in her article, which was "edited by a number of people, but I don't remember any discussion."

The last witness for the defendants was Elaine Skolnik, who testified that she had attended the meeting at which Mrs. Bergemann had used the word "blackmail". She stated that Mrs. Bergemann was a friend of hers as was Charles Schwan. She further stated that she had three and one-half years of college education. She testified that to her, the words "started legal proceedings" meant "they went to a lawyer." She stated that she had not urged any litigation against Mr. Bresler; she is a member of the Steering Committee of CFPG and voted "to endorse the citizens, which was a suit to enjoin the building of the high rise apartment and to enforce the covenants." She stated that she did not solicit for the legal fund of CFPG and that her telephone number was "probably in the papers to—as far as volunteers * * * to go out and solicit." The legal funds were to be used to "* * * see that Greenbelt was developed according to the Greenbelt Master Plan." In regard to "blackmail" she testified:

"It could be a crime, especially it is a crime when you think someone has exerted the money or tried—

where you are being paid off or where you can land in jail.

"Q. Right. Well was Mr. Bresler involved in the crime of blackmail as a result of what he was proposing to the City Council or Board of Education? A. Not the crime of blackmail.

\* \* \*

"Q. I am asking you if you think the word 'blackmail' was a proper description to be applied to what Mr. Bresler was asking the City Council or the Board of Education to do? A. In the context of the meeting, yes, it was proper."

The defendants again moved for a directed verdict at the conclusion of all the testimony and the trial court overruled this motion. The trial court pointed out that there was no plea of justification that the allegations of blackmail were true. Counsel for the defendants stated:

"What I am saying is we don't contend that the plaintiff committed blackmail, that is all. We don't intend [contend] the plaintiff committed the crime of blackmail."

The trial judge gave a comprehensive charge to the jury to which the defendants filed two exceptions. The charge and exceptions will be particularly mentioned when we consider the alleged errors in the charge.

In his opening statement to the jury, counsel for Mr. Bresler stated, in part, the following:

"Now we have not been able to determine why Mr. Bresler was singled out. I say this for this reason. *It is true he is a public figure and I suppose everybody needs a whipping boy,* but the evidence will show, one, that Mr. Bresler is *only a minority owner in this land.* Unfortunately, he is not wealthy enough to have purchased this land himself and built and developed it himself, so his interest approximates fifteen per cent or sixteen and two-thirds per cent, or in one case, I believe, it ran as high as twenty-five per cent, *but as a minority owner."* (Emphasis supplied)

As we have indicated, the jury returned a verdict of $17,500 damages ($5,000 compensatory and $12,500 punitive) in favor of Mr. Bresler and against the Publishing Association and Mr. Skolnik.

The appellants make four contentions before us :

1. The publications are constitutionally protected because (a) they relate to Bresler's qualifications as a public official, and (b) to his activities of public interest as a public figure.

2. The two reports of the meetings of the City Council at which the term "blackmail" was used are particularly entitled to constitutional protection because they are fair and accurate reports of what was said during official public meetings.

3. There was insufficient evidence as a matter of law to establish that the defendants and appellants published a false and defamatory statement about the plaintiff and appellee Bresler with knowledge that it was false or with reckless disregard of whether or not it was false.

4. The trial court erred in its instructions in four particulars.

Before considering specifically the four contentions of the appellants, several general observations should be made.

First of all, it seems apparent that but for the federal constitutional protections which the appellants allege are applicable and on which they principally rely, the facts alleged and proved in the present case would, under the Maryland law relating to libel, present a case of libel for which damages, both compensatory and punitive, could be awarded by a jury to Mr. Bresler against the defendants and appellants. It is well settled in Maryland that words which falsely charge a person with, or impute to him, the commission of a crime for which he is liable to be prosecuted and punished are actionable *per se*. As Judge Horney, for the Court, aptly stated in *American Stores Co. v. Byrd,* 229 Md. 5, 12-13, 181 A. 2d 333, 337-38 (1962) :

> "The historical distinction between slander *per se* and slander *per quod* is undoubtedly based on the theory that in words actionable *per se,* their injurious character is a fact of common notoriety, and necessarily import damages not requiring proof of special dam-

ages (cf. *Foley v. Hoffman,* 188 Md. 273) ; while, if the words used are not defamatory *per se,* they must be explained by innuendo and colloquium (cf. *Walker v. D'Alesandro,* 212 Md. 163). See *Odgers on Libel and Slander* (Am. Ed. by Bigelow), p. * * * 309.

"Consistently this Court has held that words which falsely charge a person with or impute to him the commission of a crime for which he is liable to be prosecuted and punished are actionable *per se.* See, for example, the early case of *Dorsey v. Whipps,* 8 Gill 457, 462, 1849), where, in quoting 1 *Starkie on Slander,* p. 43, it was said: ' "To impute any crime or misdemeanor, for which corporal punishment is to be inflicted, is actionable without proof of special damage." ' And see *Haines v. Campbell,* 74 Md. 158, 21 Atl. 702 (1891), where it was stated that if spoken words convey an implication of crime, they are actionable in whatever mode their meaning may be expressed, that is, whether by way of interrogation, insinuation, ironic praise or any other form of speech understood by the hearers. See also *Wheatley v. Wallis,* 3 H. & J. 1 (1810) ; *Bonner v. Boyd,* 3 H. & J. 278 (1811) ; *Long v. Eakle,* 4 Md. 454 (1853) ; *Shockey v. McCauley,* 101 Md. 461, 61 Atl. 583 (1905). Other cases in this area are collected in 14 M.L.E., *Libel and Slander,* § 14 (Commission of Crime).

"It may well be that the words—'did you get (or pick up) the $117 that was on the counter'—do not *in and of themselves carry an imputation of having stolen the money.* But there is no requirement that the defamatory words must embody an outright accusation of the commission of a crime, for '(i)n cases of slander, words take their actionable character from the sense in which they appear to have been used, and that in which they are most likely to be understood by those who hear them.' *Garrett v. Dickerson,* 19 Md. 418, 447 (1863). And if the slanderous words used are such as in ordinary 'lay conversation' will impute, or be understood to impute guilt, that is sufficient to make them

actionable *per se. Blumhardt v. Rohr,* 70 Md. 328, 17 Atl. 266 (1889). Cf. *Pollitt v. Brush-Moore, Etc., Inc.,* 214 Md. 570, 575, 136 A. 2d 573 (1957)."

*American Stores* was a far weaker case for the plaintiff on the facts in charging the commission of a crime than are the facts in the present case, but we held that the jury verdict for the plaintiff for $25,000 punitive damages was supported by the evidence.

In the instant case the word "blackmail" was used as a sub-heading without qualification. The charge of blackmail was stated in the News Review issue of October 14, 1965, and was again repeated in the next week in the issue of October 21. The appellants argue that the word "blackmail" was used in a non-criminal sense, but the intended meaning was for the jury to determine. *American Stores v. Byrd, supra.* The jury found against the appellants.

There is little doubt that a statement that a person is guilty of blackmail charges the commission of a crime for which a person may be prosecuted and punished. In Maryland extortion or blackmailing is recognized as a crime. See Code (1957) Article 27, Sections 561, 562 and 563,[6] indexed under "CRIMES AND OFFENSES" in Volume 10 as:

"Blackmail.
Threatening letters, art. 27 §§ 561 to 563. See Threats and Threatening letters."

---

6. Article 27, § 561 makes it a statutory felony, punishable by 2 to 10 years imprisonment in the penitentiary, to knowingly send or deliver a letter, with or without name attached, threatening to accuse any person of an indictable crime *or* of anything which if true would bring a person into contempt or disrepute or to do any injury to person or property, with a view or intent to extort or gain money, goods, chattels or other valuable thing; Section 562 makes it a statutory felony, punishable by 2 to 10 years imprisonment in the penitentiary, to threaten or accuse verbally a person under the same circumstances set out in Section 561; Section 563 makes it a misdemeanor, punishable by not exceeding 2 years in jail or the house of correction, to falsely accuse any person or threaten to accuse another with the intent to extort money or procure other profit, of any crime or anything which if the accusation were true would tend to bring him into contempt or disrepute.

A similar reference is made in Vol. 10 under the separate heading "BLACKMAIL."

The charging of Mr. Bresler with having committed blackmail could be found by the jury (as it was) to charge him with the commission of a crime.

As the Court of Special Appeals pointed out in Note 3 in its opinion in *Iozzi v. State,* 5 Md. App. 415, 247 A. 2d 758 (1968), in considering a prosecution under Article 27, Section 562:

> "Generally, the term 'blackmail' is equivalent to and synonymous with 'extortion.' 31 Am. Jur. 2d, 905."
> (5 Md. App. at 418, 247 A. 2d at 760)

See *Las Vegas Sun, Inc. v. Franklin,* 74 Nev. 282, 329 P. 2d 867 (1958) (use of word "blackmail" in headline or tagline of newspaper libelous per se, but reversed on other grounds); *Culver v. Marx,* 157 Wis. 320, 147 N. W. 358 (1914) (charge of blackmailing slanderous per se); *Hess v. Sparks,* 44 Kan. 465, 24 P. 979, 21 Am. S.R. 30 (1890) (referring to defendant as a "blackmailer" slanderous per se). See also *Mitchell v. Sharon,* 51 F. 424 (N.D.Calif. 1892), *aff'd* 59 F. 980 (9th Cir. 1894) (stating that charging a person with being a "blackmailer" is equivalent to charging such person with being guilty of the crime of "extortion" but holding that words were not slanderous per se because it imputed only an intent to commit blackmail, not the actual crime).

See generally 53 C.J.S. *Libel and Slander,* § 65, page 110 (1948), where it is stated:

> "Charging a person with being a blackmailer is equivalent to charging him with being guilty of the crime of extortion, and is slanderous per se in jurisdictions where extortion or blackmailing is recognized as a crime."

It is well settled that under the Maryland Constitution and our prior decisions, there was sufficient evidence to support the jury's verdict in this case.

Article 40 of the Declaration of Rights of the Maryland Constitution provides:

> "That the liberty of the press ought to be inviolably

preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

Our predecessors, in *Negley v. Farrow,* 60 Md. 158 (1883), held that liberty of the press, "is a right belonging to every one whether a proprietor of a newspaper or not, to publish whatever he pleases without the license, interference or control of the government, being responsible alone for the abuse of the privilege." (60 Md. at 176) *Negley* involved an action against the publishers and owners of "The Herald and Torchlight", a newspaper published in Hagerstown, by the plaintiff, a republican Senator from Washington County, who claimed that an article in the paper charged him with collaborating with a corrupt democratic ring, with having voted for the ring's candidate after having participated in the republican caucus in nominating another person, with aiding the ring in defeating a bill for repeal of an Act authorizing the publishing of laws in newspapers, and charging him with thereby proving false to his political obligations and a traitor to his party and bringing dishonor upon the republicans of Washington County who had elected him to the Senate. The article further charged the Senator with having been given a contract to furnish stone to a canal by its president, the head and front for the democratic ring, because he was a Senator "and had a vote to give in the Senate." The jury rendered a verdict for the plaintiff for $3,000. In holding these charges to be libelous *per se,* Judge Robinson, for the Court, stated:

> "No one denies the right of the defendants to discuss and criticise boldly and fearlessly the official conduct of the plaintiff. It is a right which, in every free country belongs to the citizen, and the exercise of it, within lawful and proper limits, affords some protection at least against official abuse and corruption. But there is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one

goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured.

"The fact that one is the proprietor of a newspaper, entitles him to no privilege in this respect, not possessed by the community in general. The law recognizes no duty, imposed on him, arising from his relations to the public, to defame and libel the character of any one, and if he does, it is no answer to say, he did so in good faith, and without malice, honestly believing it to be true. Malice in one sense may be said to be an essential element in an action for libel, but not malice in the ordinary sense of hatred or ill will against the person, of whom the defamatory words are spoken. If the publication be in itself libellous, the law in all such cases implies malice; in other words it says, you have no right to libel another, whatever may have been the motive or intention." (60 Md. at 176-77)

*Negley v. Farrow* was cited with approval and portions of the opinion of the Court in that case were quoted by us in *A.S. Abell Co. v. Kirby,* 227 Md. 267, 274-75, 176 A. 2d 340, 343 (1961).

In addition to the publications that Mr. Bresler had committed blackmail, there were publications that he had engaged in "An unethical trade", had been guilty of "skulduggery", had had legal proceedings "started against him for failure to make construction corrections in accordance with county standards." These allegations were injurious to Mr. Bresler in his business as a contractor and were libelous *per se.* As Judge (later Chief Judge) Prescott, for the Court, stated in *Thompson v. Upton,* 218 Md. 433, 437, 146 A. 2d 880, 883 (1958):

"We have so recently had occasion to pass upon the legal principles involved herein, *Pollitt v. Brush-Moore, Etc., Inc.,* 214 Md. 570, 136 A. 2d 573, that it will be unnecessary to unduly elaborate upon them. It has been repeatedly stated that the scope of libel is

wider than that of slander. This Court stated in *Bowie v. Evening News,* 148 Md. 569, 574, 129 A. 797, that it had been said that there is no definition of the term 'libel' sufficiently comprehensive to include all cases. We shall not attempt to do what has baffled the Courts for these many years, namely, to compose an all-inclusive definition thereof. However, libel includes any unprivileged (i.e., a publication not having an absolute privilege), false and malicious publication which by printing, writing, signs or pictures tends to expose a person to public scorn, hatred, contempt or ridicule, *Foley v. Hoffman,* 188 Md. 273, 284, 52 A. 2d 476; and also embraced therein is any such publication that relates to a person's office, trade, business or employment, if the publication imputes to him some incapacity or lack of due qualifications to fill the position, or some positive past misconduct which will injuriously affect him in it. *Foley v. Hoffman, supra; Pollitt v. Brush-Moore, Etc., Inc., supra,* at p. 577."

This rule has not only been applied to those who practice the professions, such as attorneys, clergymen, physicians and teachers, but also to those engaged in business. The rule was specifically applied to contractors in *Plenol v. Beuttler,* 253 Iowa 259, 111 N.W.2d 669 (1961); *Schneidman Heating, Inc. v. New York Plumbers' Specialties Co.,* 238 App. Div. 318, 264 N.Y.S. 146 (1933); *Williams v. Daily Review, Inc.,* 236 Cal. App.2d 405, 46 Cal. Rptr. 135 (1965); see generally 53 C.J.S. *Libel and Slander,* § 37 at 85 (1948).

In regard to the defense of fair comment, Judge (now Chief Judge) Hammond, after a review of the authorities, stated, for the Court, in *A. S. Abell Co. v. Kirby, supra*:

"Maryland has consistently followed the majority rule—that defamatory misstatement of fact cannot be defended successfully as fair comment. *Snyder v. Fulton,* 34 Md. 128, 137-8; *McBee v. Fulton,* 47 Md. 403, 416; *Brush-Moore Newsp. v. Pollitt,* 220 Md. 132, 138. Cf. *Negley v. Farrow,* 60 Md. 158; *Coffin v. Brown,* 94 Md. 190. The distinction between 'fact' and

'opinion,' although theoretically and logically hard to draw, is usually reasonably determinable as a practical matter: Would an ordinary person, reading the matter complained of, be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact? An opinion may be so stated as to raise directly the inference of a factual basis, and the defense of fair comment usually has been held not to cover an opinion so stated." (227 Md. at 273-74, 176 A. 2d at 343)

There would seem to be little doubt that under the Maryland law, apart from the federal constitutional protections which the appellants allege apply, the jury's verdict and subsequent judgment thereon would be held to be supported by the evidence and affirmed.

Secondly, we should observe preliminarily that we have grave doubts that Mr. Bresler was a "public official" or even "a public figure" within the purview of the holdings of the Supreme Court of the United States in *New York Times Co. v. Sullivan*, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964), and subsequent cases following and applying it, and in *Curtis Publishing Co. v. Butts* and its companion case, *Associated Press v. Walker*, 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967). Mr. Bresler was not a "public official" of Prince George's County, but was a member of the Maryland House of Delegates from Montgomery County. There is no suggestion that any of his activities as a member of the House of Delegates from another County had had any particular effect upon Prince George's County or upon Greenbelt and its citizens and property owners. Substantially all of the libels were published some *seven months before* he was asked by Governor (now Vice President) Agnew to run for Comptroller of Maryland. Indeed until the issue of the News Review of May 19, *1966,* there was no mention in any of the relevant articles, letters or editorials published by the News Review of the fact that Mr. Bresler was a member of the House of Delegates or held *any public office.* The articles were directed at Bresler as a *private developer* of land in the Greenbelt area. There is no suggestion that he had

any political or other prominence at the national, state, county or municipal level. However, in the present case we are not called upon to make this determination inasmuch as counsel for Mr. Bresler conceded in his opening statement that his client was a "public figure" and perhaps, more importantly, the trial judge in the lower court's instructions to the jury (as will be considered more fully later in this opinion) imposed the necessity upon the plaintiff Bresler to show actual malice within the definition of *New York Times* and Mr. Bresler did not object to the charge. The jury having found in his favor and there being no cross-appeal by him, we need not consider whether or not the trial court's charge was unduly favorable to the appellants as they clearly cannot object to this.

1.

The appellants contend that the publications involved in this case are entitled to federal constitutional protection under the decisions of the Supreme Court of the United States in *New York Times v. Sullivan, supra; Garrison v. Louisiana,* 379 U. S. 64, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964); *Rosenblatt v. Baer,* 383 U. S. 75, 86 S. Ct. 669, 15 L.Ed.2d 597 (1966); *Beckley Newspapers Corp. v. Hanks,* 389 U. S. 81, 88 S. Ct. 197, 19 L.Ed.2d 248 (1967); and *St. Amant v. Thompson,* 390 U. S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968), in regard to "public officials" and the decision of that Court in the companion cases of *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker, supra,* in regard to a "public official" and a "public figure" within the meaning of those cases on the theory that the publications relate to Bresler's qualifications to hold office and concern his activities of public interest as a public figure. We have already indicated our doubt that the publications come within the ambit of the cases mentioned, and we need not repeat our reasons for this doubt. As we pointed out, however, because of the posture of the case and in light of the instructions of the trial court to the jury, it is not necessary for us to resolve this doubt as we may assume, *arguendo,* that Bresler was a public official and a public figure within the meaning of the federal cases mentioned, and also that the publications had relevance to Bresler's activities as a member of the Mary-

land House of Delegates from Montgomery County, or to his activities as a "public figure" (as contrasted with his private business activities with others), as a developer of land and builder of houses and apartments in the Greenbelt area.

2.

The second point raised by the appellants is that the two reports of the City Council meetings held on October 11 and 18, 1965, are particularly entitled to full constitutional protection because they are fair and accurate reports of what was said during public meetings. The appellants state in their brief, however, that recovery "based on accurate reports of official public meetings should be permitted, if at all, only under the most extraordinary circumstances where the evidence clearly establishes that a false factual charge of a highly damaging nature was published with knowledge of its falsity or with serious doubt as to its truthfulness." What the appellants apparently overlook is that there was credible evidence from which the jury could (as it obviously did) find that the present case was indeed a "most extraordinary" one in which the publishers of the false statement knew it was false and that nothing at the public meeting justified the charge that Bresler had committed blackmail. As we have indicated, Mr. Skolnik and several witnesses for the appellants connected with the publication testified that they knew that "blackmail" indicated criminal conduct and further that nothing occurred at either of the October 1965 meetings of the City Council which justified such a charge of criminal conduct by him. Counsel for the appellants also stated at the trial that they did not contend that Bresler committed blackmail.

It is doubtful that there is any privilege of reporting, as items of news, the proceedings at a public meeting of a City Council, as contrasted with the publishing of an official report of the City Council itself. See *Buckstaff v. Hicks,* 94 Wis. 34, 68 N. W. 403, 59 Am. St. R. 853 (1896). In *Buckstaff,* a councilman of the City of Oshkosh, Wisconsin stated at a council meeting that the plaintiff, State Senator Buckstaff (from the Oshkosh district), who was opposing a charter amendment for Oshkosh, was "four-fifths of his time in a state of intoxication." The Oshkosh Northwestern published this statement. The Supreme Court of Wisconsin affirmed a judgment for Senator

Buckstaff, entered upon a directed verdict for the plaintiff as to liability, and held that the report of the hearing before the City Council did not give the newspaper a qualified privilege to print the libelous material. Mr. Justice Winslow, for the Supreme Court of Wisconsin, stated:

> "It is certain that the publication in question is not the report of the proceedings of a court or legislative body. The term 'legislative body', in this connection, has not been extended to cover a City Council meeting. Newell, Defamation, S. & L. 599; Odyers Libel & S. 260. Doubtless, an official report of a city council meeting required to be published by law in the official city paper would be privileged; but that is not the present case. The report before us was not an official report. No official report of the meeting was even made or published. The article in question was a mere voluntary report, published as an item of news; hence it cannot be protected as an official report of a council meeting probably would be, nor does the fact that the newspaper was in fact the official paper of the city cut any figure." (94 Wis. at 39, 68 N. W. at 404, 59 Am. St. R. at 855)

Even if the qualified privilege did ordinarily apply, however, it will not protect the publisher against liability in damages for the publication of *irrelevant defamatory matter* and for the *repetition* of false statements not otherwise privileged. *Negley v. Farrow, supra.* See *Pulvermann v. A. S. Abell Co.,* 228 F. 2d 797, 802 (4th Cir. 1956), in which the Court, in summarizing the Maryland law, stated: "The rule in Maryland is that repetition of false statements is not privileged." See also Prosser, *The Law of Torts,* § 108 at 787 (3rd Ed. 1964).

Nor was it likely that *Bresler, himself,* would have access to the News Review to present his position in the matter and show that he had not committed blackmail, was not guilty of skulduggery or had not been sued for failure to carry out the county building requirements, in view of the refusal of the News Review to permit him to subscribe to it, even though it did mail some 75 copies of the publication to others at a nominal charge.

The issue before the City Council was not whether Bresler had committed blackmail and that issue was irrelevant to the real issue, as several witnesses for the appellants indicated. There appears to be no justification, in any event, for the *republishing* of the term "blackmail" in the issue of October 21 after its original publication in the issue of October 14. Certainly, there is even less justification for the use of the word "blackmail" as a sub-headline, standing alone and without qualification. See *Las Vegas Sun, Inc. v. Franklin, supra.*

In regard to the *accuracy* of the reporting of what occurred at the City Council meetings, Mrs. Williamson testified that the word "skulduggery" was not used by any speaker at the meeting to whom it was attributed or even by her. She testified that: "I did not use that word. This is a good example of what happens on Tuesday next when the other members of the Editorial Board will read through an article." There is little doubt that the word "skulduggery" was intended to indicate dishonest conduct on the part of Bresler and to hold him up to ridicule and contempt. The word is defined in the *Webster's New International Dictionary,* (Second Ed. 19) as "Trickery; secret or hidden wickedness or practice" and in the *Random House, American College Dictionary* (1961) as "N. U.S., dishonorable proceedings, mean dishonesty or trickery." The jury could properly conclude that the reports of the hearing were not accurately reported and were, also, published with a knowledge of their falsity or with serious doubt of their truthfulness.

### 3.

The appellants contend that there was insufficient evidence as a matter of law that they published a false and defamatory statement about Mr. Bresler with knowledge that it was false or with reckless disregard of whether or not it was false and that they were entitled to a directed verdict for this reason. We do not agree with this contention.

The case is an extraordinary one in that Mr. Bresler was able to establish from Mr. Skolnik and from several of the witnesses for the appellants, e.g., Mayor Smith, Mrs. Williamson and Mrs. Skolnik, that the appellants did in fact know that the use of the term "blackmail" did import serious criminal conduct

on Bresler's part and further that there was nothing which was before the meeting or which happened at the meeting which would justify the use of such a term in regard to Mr. Bresler. It is not surprising, therefore, that the jury found—as they were required to find under the trial court's charge—that the charge of blackmail was false, and accordingly they could have found that it was known by the appellants to have been false or was published with reckless disregard of whether it was false or not.

The appellants suggest that because they published in the October articles that at each meeting there was one person who expressed the "opposite opinion", i.e., that Bresler was not guilty of blackmail, there was no "unfair comment." In our opinion, however, these statements could indicate that the original use of the term "blackmail" was indeed intended and understood to be used in its sense of importing serious criminal conduct on Bresler's part. As we have indicated, there was evidence from which the jury could and did find that this charge was false, known to be false but was published with actual knowledge of its falsity or with a reckless disregard of whether or not it was false. These facts, in our opinion, distinguish the present case from the cases relied on by the appellants, i.e., *Parker v. Kirkland*, 298 Ill. App. 340, 18 N.E.2d 709 (1939) (involving a statement by counsel for the newspaper before a quasi-judicial body where the charge of blackmail was relevant to the issues) ; *Bennett v. Seimiller*, 175 Kan. 764, 267 P. 2d 926 (1954) (involving a charge that the plaintiff was a "traitor" to his local union which the court held was not slanderous, *per se* in the context used, as not charging the commission of a crime) ; *Flanagan v. Nicholson Publishing Co.*, 137 La. 587, 68 So. 964 (1915) (involving a charge that the plaintiff's "own union * * * [denounced] him as a traitor" which the court held was not slanderous *per se* in the context used) ; *Pulvermann v. A. S. Abell Co., supra,* and *St. Amant v. Thompson, supra.* In the latter case, the Supreme Court of the United States, in a case involving the alleged libel of a public official, stated that there must be convincing proof that the appellants "in fact entertained serious doubts as to the truth" of the published statement. It would be difficult to conceive of a case in

which there was more "convincing evidence"—the admissions of one of the appellants and of several of their witnesses—that the appellants did indeed have actual knowledge of the falsity of the charge or, in any event, entertained "serious doubts as to its truth."

In considering the failure of Mrs. Skolnik to check either the court records or with Bresler, himself, by telephone relative to the false charge that various homeowners "had started legal proceedings" against Bresler in regard to construction defects in their homes built by him, the appellants argue that Mrs. Skolnik's failure to check first was at the most negligence and was not a "reckless disregard of the truth" as required by *St. Amant.* In our opinion, the jury could have concluded from the evidence that Mrs. Skolnik's failure in this regard did amount to a "reckless disregard of the truth." In the first place, Mrs. Skolnik is a knowledgeable, educated person with three and one-half years of college education. She is experienced as a reporter for the News Review and she must have known that the report of the actual institution of suits against a builder and developer "for failure to make construction corrections in accordance with county standards" was calculated to result in serious injury to Bresler's standing as a builder and developer, to his reputation as a competent builder and developer and would hold him up to ridicule and contempt in the very area in which he was engaged in building and construction.

Secondly, it is correct, as the appellants point out, that, in *New York Times,* the newspaper was not held to have been guilty of such recklessness as is necessary for a finding of actual malice in regard to a public official (but was only guilty of negligence), in failing to check its own files to discover that the statement published by it was false. In the instant case, however, Mr. Skolnik testified that the News Review had "a general Rule that if you don't know the facts, if there is confusion about the facts, you call the principals involved." He also stated that the News Review had on at least two occasions, telephoned Bresler, himself, to verify certain charges made against him and in both instances had discovered that the charges were in fact false and unjustified, and they were not published. The jury might well have found that in the light of this established pub-

lishing policy and practice as well as the other circumstances already mentioned, the failure by Mrs. Skolnik to verify either in the court records or by a simple telephone call to Bresler the truth of the serious charge of the institution of the suits, amounted to recklessness sufficient for a finding of actual malice.

Then too, in the present case, there were sufficient facts to indicate to the jury, an affirmative hostility, a personal animus, against Bresler and a desire on the part of the publishers of the News Review to injure his reputation and standing in the Greenbelt area through the use of the false charges. The following facts are sufficient to justify such a conclusion by the jury. The headings of the publications, themselves, such as "AN UN-ETHICAL TRADE", "ANOTHER CRIPPLING BLOW", "BRESLER REPUDIATES COVENANT", "STARTLED AT BRESLER", "BRESLER INFLUENCES", "BRESLER SUITS", "CITY BATTLES BRESLER", many of which were written by Mr. Skolnik himself; the formation of the CFPG legal fund for the express purpose of filing suits against Bresler by Mr. Stern and Mrs. Skolnik, both of whom were members of the staff of the News Review; the soliciting of funds for the CFPG legal fund through the News Review and the solicitation of collectors by Mrs. Skolnik; the misrepresentation to several persons through the paper that the CFPG legal fund was to be used *only* to enjoin the "actions of developers which are contrary to the Greenbelt Master Plan" when in fact the legal fund was used to institute (unsuccessful) damage actions against Bresler amounting to nearly $2,000,000 in claimed damages; the close connection between the Skolniks, Mrs. Bergemann, Mrs. Rosetti and Mr. Herling (those to whom the word "blackmail" was attributed), Mrs. Sucher and Mrs. Williamson (who wrote the articles) and Charles Schwan, the president of GHI and the principal opponent of Bresler on the high school and zoning issues; the opposition of the News Review to the zoning of Parcels 1 and 2 for townhouses, but with no opposition to the construction of townhouses by GHI, itself; the fact that Bresler was allegedly making a profit from land once owned by GHI but purchased by Bresler; the attacks on Bresler for allegedly repudiating his agreement in regard to the building of a high-rise apartment instead of townhouses but

with no corresponding attack upon another builder and developer in the area who violated his agreement to build townhouses instead of garden apartments; and, finally, the attack upon Bresler (who was to be afforded "no more or no less, no worse or no better treatment than any other developer in the City of Greenbelt" according to the testimony of Lewis Bernstein, a witness for the appellants) for allegedly building 12 instead of the "average" of seven units per acre at one end of Charlestowne Village, but remaining silent when the City of Greenbelt approved the Lakeside North development with covenants restricting density to 12 units.

In our opinion, it cannot be said in the present case that there was insufficient evidence (with all reasonable inferences from that evidence) from which a jury could find that the appellants published false and defamatory statements about Mr. Bresler with knowledge that they were false or with reckless disregard of whether or not they were false. The appellants were not entitled to a directed verdict in their favor for this reason and the trial court properly, in our opinion, refused to grant their motion for a directed verdict and for a judgment n.o.v.

### 4.

We now come to the final contention of the appellants, i.e., that the trial court erred in its charge to the jury in four particulars. These are, (a) by instructing the jury that the constitutional protection was limited to comments relating to Bresler's "official conduct", (b) by instructing that "actual malice" consisted of evil intent, a state of mind best described as spite, hostility or deliberate intention to harm which could be inferred from the language of the publications in issue, (c) by refusing to instruct in regard to the meaning of "reckless disregard of truth" under the federal constitutional standard, and (d) by instructing that the appellants conceded that the publications "were not true."

It is well settled in Maryland that in considering alleged errors in a charge of the trial court to the jury, we will consider the charge as a whole and will not select, out of the context of the whole charge, individual statements which might, of themselves and out of context, contain inartificial methods of ex-

pression or appear to be misleading. *Jones v. Federal Paper Board Co.*, 252 Md. 475, 250 A. 2d 653 (1969) and cases therein cited.

It is equally well settled that we will only concern ourselves on appeal with the exceptions to the charge filed by the objecting party at the conclusion of the charge itself. Maryland Rule 554 d and e. *Jones v. Federal Paper Board Co., supra.*

In the present case, the trial court gave a comprehensive and carefully considered charge to the jury.

After advising the jury that the court's instructions in regard to the law were binding upon them, but the findings in regard to the facts were for the jury; that the weight of the evidence is not established by the number of witnesses but by the quality the jury attributed to the testimony; that questions asked by the court should carry no more weight with the jury than those asked by counsel, the trial court then gave the jury the definition of libel as follows :

> "You are instructed that the burden is upon the plaintiff to establish by a preponderance of the evidence that the publication imputed to him a crime, or disgraceful, dishonest or immoral conduct or was otherwise injurious to his private character or credit, and if you are unable to conclude from the preponderance of the evidence that the publication bears a meaning ascribed to it by the plaintiff, or if you find that the evidence is equally balanced on that issue, then your verdict must be for the defendant.
>
> "The law presumes, until the contrary appears, that every person has a good character and has done nothing to forfeit the good opinion of the community. The law regards a good reputation as valuable to its possessor, and the publication of a libel by which a good name is impaired is an injury for which damages may be recovered."

In regard to considering the publication complained of, the trial court stated :

> "In considering the publication complained of, you must consider the publication as a whole—the Court

would say in this case we are talking about serious, [a series, a] number of publications—and determine the meaning of the publication and how it would be understood by ordinary readers from the entire context thereof with the other facts and circumstances shown by the evidence.

"Where a publication is susceptible of two meanings one of those which would be libelous and the other not, it is up to you to say which of the two meanings would be attributable to it, by those to whom it is addressed or by whom it may be read. In reaching your decision you can consider all the circumstances surrounding the publication, which includes all of the evidence which has been admitted.

"It is no defense that in making the defamatory statement the defendant either repeated or quoted a statement by another. It makes no difference whether a defamatory statement is originated by the defendant or merely repeated by him or it, and I use it, because we are talking about a corporation as well as an individual, on the basis of a statement made by it or him.

"You are instructed as a matter of law that one who repeats another's defamatory statement is legally responsible unless the story is true, the repetition privileged—I will repeat that—unless it is true the repetition is privileged, which I will define for you in a minute what privilege is—or the plaintiff consented to the publication."

In regard to the truth of the publications, the trial court instructed:

"Going to the factor of the truth, there is no contention in this case, it is conceded by the defendant these allegations were not true. That is that Mr. Bresler was guilty of blackmail.

"There is no evidence before you, no contention by the defendant that they were true."

In considering the question of "fair comment", the trial court instructed the jury:

> "In matters of public interest, the law recognizes the importance of free discussion and the right to express opinions, comments and criticisms concerning such matters. Thus it accords to the press and the general public the right to comment upon and criticize these matters of public interest freely and openly. But this right to express opinions on matters of public interest is only present where the fact and criticism and comment are drawn are true. It is only insofar as the facts set out by the publisher are true that he would claim the right of free and open criticism of open comment on those facts. Thus at the outset if you find the basis on which the criticism or facts are made are true, then you must not find on the issue of fair comment.

> "If, however, you determine that the facts on which the criticism is based are true, then you must decide whether the criticism or expression of opinion complained of was fair. You are instructed that in order for the criticism to be fair comment in the eyes of the law it is not necessary for you to personally agree with it or even the majority of reasonable men would agree with it. It is only necessary the criticism be one which a reasonable man could draw from the fact even though it is not the correct criticism or opinion of the most reasonable criticism or opinion. Accordingly, if you determine the criticism or opinion in the article complained of was one which an honest person could reach, you must find for the defendant on the issue of fair comment, unless you determine by a preponderance of the evidence that the comment or criticism did not actually represent the opinion of the author, but instead was published with malice or a reckless disregard of whether it was true or false.

> "The Court would here emphasize that the newspaper or a publisher has a right and responsibility to

attend meetings, to listen to what is going on, and to rely upon people which it knows or has very good grounds to believe are responsible citizens. And such statements repeated and/or published, unless with actual malice, or knowledge that they are false, reckless disregard for whether they are true or false, is not libel.

"The law recognizes the importance of free discussion and criticism and matters of public interest to the extent that it grants immunity even with respect to the publication of foolish and prejudicial criticism if they are not published with malice, knowledge of their not being true, it is knowledge they are false, or reckless disregard of whether they are true or false. The right of comment or criticism that has been explained to you is the same whether the defendant is a newspaper or a member of the public generally.

"If you find that the publication complained of relates to a matter of interest to one or both of the parties to the publication or communication and that the means of publication was reasonably adapted to the protection of that interest, you are instructed that the publication is qualifiedly privileged and your verdict should be for the defendant unless you find that the publication was made with actual malice, knowledge of its falsity, or reckless disregard of whether it was true or false."

The trial court then gave examples of absolute and qualified privileges and told the jury:

"You are instructed the publication is qualified[ly] privilege[d] and your verdict should be for the defendant unless you find again the publication was with actual malice, knowledge of its being false or reckless disregard of whether it was true or false."

The trial court then defined "malice" quoting from *Black's Law Dictionary* as follows:

"* * * the Court would indicate that Black's Law Dic-

tionary indicates malice as follows: the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances of the law would imply an evil intent."

An additional instruction was then given on the burden of proof on the plaintiff, as follows:

"In addition thereto, the Court has instructed you that if you determine the defense of qualified privilege asserted by the defense applies to this case, that is fair comment privilege, the plaintiff must then prove by a preponderance of the evidence that the defendant published the article complained of with actual malice toward the plaintiff. Therefore, the Court will now again define for you another indication of what malice is. Actual malice involves the state of mind that the defendant, best described as spite, hostility or deliberate intention to harm. Further, although honest indignation and strong words are not evidence of express malice, or actual malice, actual malice may also be present in the eyes of the law if you determine by a preponderance of the evidence that the defendant's conduct, published in the article complained of constituted malice, reckless disregard of whether they are true or false.

\* \* \*

"\* \* \* in determining whether there was actual malice on the part of the defendant, in the publication of the articles complained of, you may consider all the relevant evidence in the case, including the character of publication, the circumstances which inspired its publication, the presence or absence of a reasonable basis for making the statement, and the presence or absence of provocation.

"With respect to your consideration of presence of actual malice on the part of defendant, you may infer its presence from the language or circumstances of the publication, but this may be done only if the character of the publication is so excessive, intemperate, unreasonable and abusive as to defy any other reasonable

conclusion than that the defendant was moved by actual malice toward the plaintiff."

The trial court then instructed in regard to compensatory, nominal and punitive or exemplary damages. In regard to punitive damages, the trial court told the jury:

"Punitive damages are claimed in this case.

* * *

"Punitive damages sometimes called exemplary or vindictive damages, may, in certain circumstances, be awarded by you, in addition to the verdict for compensatory or nominal damages. Punitive damages do not partake of compensation to an injured plaintiff. Rather, the law permits juries in civil cases to assess punitive damages against the defendant as punishment for outrageous conduct and as [a] deterrent to others to refrain from engaging in such conduct.

"Punitive damages may be assessed against an individual defendant when the publication of a libel was done with actual malice toward the plaintiff, or when the defendant acted with recklessness or wanton indifference to the rights of the plaintiff.

"In deciding whether in the publication complained of the defendant was acting with actual malice toward the plaintiff, you should consider all the circumstances and evidence of the case. You should consider the intent with which the matter was published, the motives of the defendant in publishing the matter, the presence or absence of provocation for the publication, the presence or absence of reasonable grounds for making the statement. You shall also consider the manner in which the defendant received the information on which the publication was based, whether the defendant exercised an honest judgment or whether the publication was based on information received from persons whom the defendant believed to be reliable persons. If after weighing and considering these facts you are convinced the defendant acted with actual malice toward the plaintiff, then you may, I am not saying you shall, you may,

assess punitive damages against the defendant. Whether to do so, even if you find actual malice, is within your sound discretion; the law does not require you to assess punitive damages. If you decide to assess punitive damages the amount of such damages is left to your good judgment."

In regard to blackmail, the trial court gave the following definition:

"Black's Law Dictionary defines [blackmail as] the extortion of money by threats or overtures toward criminal prosecution or the destruction of a man's reputation or social standing."

The trial court further told the jury:

"* * * you must find, as I have told you the burden of proof is on the plaintiff to prove by a preponderance of evidence the allegation of libel. With the law that I have given you you are obligated to find malice, knowledge of the falsity, reckless disregard of what is true or false in order to find [for] the plaintiff. And if you find these elements then you may find for the plaintiff. Otherwise you will find for the defendant."

After hearing the exceptions of counsel for the defendants to the charge (counsel for the plaintiff made no exceptions), the trial court gave the following additional instruction:

"The Court will give you one additional instruction as a matter of law, that in a suit for libel you have a treating differently of different people. A public official or a public figure, the law permits under the question of privilege or fair comment a wider latitude. In other words, in matters that are of general public interest, [as] the articles complained of were, if you find by a preponderance of the evidence was public activities, there is a constitutional protection for publication of matters regarding a public official or a public figure. There is no denial in this case Mr. Bresler was not a member of House of Delegates and a can-

didate for Comptroller of the State of Maryland when the last article was published. And the plaintiff cannot recover unless you find, as I say again, by a preponderance of the evidence, that the articles were published with actual malice, knowledge of their being false, or reckless disregard of whether they were true or not."

After further objection by counsel for the defendants, the trial court gave a further additional instruction as follows:

"Very well, Mr. Foreman and gentlemen of the jury: The Court added to my original instruction regarding public officials, will include public figure, because in the manner which it was done I am of the opinion there may be some misconception of exactly what I meant with the original instructions as to public officials and public figures.

"I am going to give you the additional instruction, which is the law on this subject. There is no contention here that the statements regarding blackmail were true. The Constitutional guarantee requires a rule that prohibits a public official or public figure from recovering damages for defamatory falsehood relating to his official conduct unless he proves that the statements were made with actual malice, that is with knowledge that it was false or with reckless disregard of whether it was false or not. The same thing is said in the same vein, definition of malice is constitutionally insufficient where discussion of public affairs is concerned unless the plaintiff establishes that the utterances were false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true."

Counsel for the defendants (appellants) then made the following objections:

"I renew my objection, Your Honor, in view of the prior instructions that have gone before this, in which malice is adverted to as involving hostility, that this should be made clear to the jury that evidence of evil

motive, ill will, hostility, does not constitute malice within the definition of the Constitution. And secondly, Your Honor, I object to the construction on the ground that it does not make it clear that Constitutional protection to comment upon public figures with respect to their public—their activities in the public interest as opposed to their official conduct because they are in the official—they have no official duties and are not officials."

(a)

The appellants contend, first of all, that the trial judge erred in instructing the jury that the constitutional protection was limited to comments relating to Mr. Bresler's "official conduct". The appellants base their contention on the portion of the charge given in the second additional instruction in which the trial court stated in part, "The Constitutional guarantee requires a rule that prohibits *a public official or public figure* from recovering damages for defamatory falsehood relating to *his official conduct* unless he proves that the statements were made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (Emphasis supplied) Earlier in the charge, the trial court had instructed the jury, "A *public official or a public figure,* the law permits under the question of privilege or fair comment a wider latitude. In other words, *in matters that are of general public interest,* [as] the articles complained of were, if you find by a preponderance of the evidence was public activities, there is a constitutional protection for publication of matters regarding *a public official or public figure.* There is no denial in this case that Mr. Bresler was not a member of House of Delegates and a candidate for Comptroller of the State of Maryland when the last article was published. And the *plaintiff cannot recover* unless you find, as I say again, by a preponderance of the evidence, that the articles were published *with actual malice, knowledge of their being false, or reckless disregard of whether they were true or not."* (Emphasis supplied) The trial court further stated: "In reference to the last instruction I gave you, with reference to his official conduct *or words* as a public official or a public figure."

The trial court, in effect, in the entire charge clearly instructed the jury that in order for the plaintiff to recover it must find by a preponderance of the evidence that the *New York Times* test had been established for *both* Bresler's activities as a public official and as a public figure. We have indicated that this was a *more favorable* instruction for the defendants than they were entitled to have received in light of the factual circumstances. It was also probably more favorable to the defendants than the decision of the Supreme Court in *Butts* justified for "public figures."

In *New York Times,* Mr. Justice Brennan, for the Supreme Court, articulated the rule in regard to "public officials" as follows:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is with knowledge that it was false or with reckless disregard of whether it was false, or not." (376 U. S. at 279-80, 84 S. Ct. at 726, 11 L.Ed.2d at 706)

In the concurring opinion of Mr. Justice Goldberg, concurred in by Mr. Justice Douglas, which advocated an even more stringent constitutional guarantee than the majority, it was pointed out that:

> "This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or a private citizen." (376 U. S. at 301, 84 S. Ct. at 737, 11 L.Ed.2d at 721)

In *Butts* and *Walker,* federal constitutional protection was extended to publications in regard to the activities of "public figures." The opinion of the Court in *Butts* and *Walker* was written by Mr. Justice Harlan, in which Mr. Justice Clark, Mr. Justice Stewart and Mr. Justice Fortas joined. These four justices were of the opinion that the federal rule in regard to "public figures" was not as vigorous as the rule enunciated in

*New York Times* in regard to public officials. Mr. Justice Harlan stated, in part, as follows:

"In *Time, Inc. v. Hill, supra,* 385 U. S., at 390, 87 S. Ct. at 543 we counseled against 'blind application of *New York Times Co. v. Sullivan*' and considered 'the factors which arise in the particular context.' Here we must undertake a parallel evaluation." (388 U. S. at 148, 87 S. Ct. at 1988, 18 L.Ed.2d at 1107)

\* \* \*

"\* \* \* the rigorous federal requirements of *New York Times* are not the only appropriate accommodation of the conflicting interests at stake. We consider and would hold that a 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, *on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.*" (Emphasis supplied) (388 U. S. at 155, 87 S. Ct. at 1991, 18 L.Ed.2d at 1111)

\* \* \*

"Where a publishers' departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, *we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse.*" (Emphasis supplied) (388 U. S. at 161, 87 S. Ct. at 1994, 18 L.Ed.2d at 1114)

Mr. Chief Justice Warren, however, whose concurrence made up the majority of five, was of the opinion that the *New York Times* rule in regard to "public officials" should be applied in full vigor, to "public figures."

In view of the close decision in the Supreme Court, it is not entirely clear what the correct rule is in regard to "public figures", but, as we have already indicated, it is of no importance in the present case because the trial court applied the *New York*

*Times* rule to the publications relating to Bresler either as a "public official" or as a "public figure" adopting, in effect, the position of the Chief Justice in *Butts* and *Walker*.

The trial court instructed the jury a number of times that to find for the plaintiff the jury must find, by a preponderance of the evidence that the publication was with actual malice, knowledge of its falsity or reckless disregard of whether it was true or not—substantially in the language of the *New York Times* test. Indeed in several instances the test was broader than that of *New York Times* as it was not always limited to a "public official" or a "public figure." This however was favorable to the defendants and injurious, if at all, to the plaintiff, and, as we have stated, the appellants cannot complain of this.

As Mr. Justice Harlan stated in *Butts*:

> "The impact of a jury instruction 'is not to be ascertained by merely considering isolated statements but by taking into view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied.' *Seaboard Air Line R.Co. v. Padgett,* 236 U. S. 668, 672, 35 S. Ct. 481, 482, 59 L. Ed. 777." (388 U. S. at 156-57, 87 S. Ct. at 1992, 18 L.Ed.2d at 1112)

This is in accord with the usual Maryland rule as we have already stated. In our opinion, considering the charge as a whole, the jury understood that it was required to find from a preponderance of the evidence that the *New York Times* rule applied to the activities of Bresler both as a public official and as a public figure. We find no error in the charge in this regard of which the appellants can complain.

### (b)

The appellants next contend that the trial court erred in instructing the jury that actual "malice" consisted of evil intent, a state of mind best described as spite, hostility or deliberate intent to harm which could be inferred from the language of the publications in issue.

As we have already seen the trial court did define malice as the "intentional doing of a wrongful act without just cause or

excuse, with an intent to inflict an injury or under circumstances of the law would imply an evil intent" and further that "actual malice involves the state of mind * * * [of] the defendant, best described as spite, hostility or deliberate intention to harm." The trial court also stated that the jury might infer the presence of actual malice "from the language or circumstances of the publication", but added this quite restrictive instruction "but this may be done only if the character of the publication is so excessive, intemperate, unreasonable or abusive as to defy any other reasonable conclusion that the defendant was moved by actual malice toward the plaintiff."

Here again, the appellants separate one aspect of the charge from the charge as a whole and claim that this was error under the decision in *Rosenblatt v. Baer, supra* and *Beckley Newspaper v. Hanks, supra,* as well as *Washington Post Co. v. Keogh,* 365 F. 2d 965 (D.C. Cir. 1966), *cert. denied,* 385 U. S. 1011 (1967).

The appellants overlook, however, that in a libel action in which punitive damages are sought, it was proper to define "actual malice" as requiring a finding of ill will, spite, hostility and a deliberate intention to harm." Later in the charge the trial judge indicated that if the jury found that the libel was done with "actual malice" toward the plaintiff "or when the defendant acted with recklessness or wanton indifference to the rights of the plaintiff", the jury could assess punitive damages.

In *Butts,* the opinion of the Court written by Mr. Justice Harlan, indicates that the State law in regard to punitive damages is to be considered and applied. He stated, for the Supreme Court:

> "Moreover, punitive damages require a finding of 'ill will' under general libel law and it is not unjust that a publisher be forced to pay for the 'venting of his spleen' in a manner which does not meet even the minimum standards required for constitutional protection." (388 U. S. at 161, 87 S. Ct. at 1994, 18 L.Ed.2d at 1114)

See also *Snyder v. Fulton,* 34 Md. 128, 138, 6 Am. R. 314, 321 (1871).

As we have indicated, when the trial court instructed the jury in regard to the constitutional protection in regard to comment upon the activities of Mr. Bresler as a "public official" or as a "public figure", it stated the formula in *New York Times* as the applicable test and limited the jury to a finding based on that test. This was done several times, the final instruction being made after considering the objections of counsel for the defendants, giving the exact language from *New York Times*.

In our opinion, taking the charge as a whole and considering the last instruction given by the trial court, the jury was instructed and must be assumed to have understood that it must find that the publications in issue were made "with knowledge that it was false or with reckless disregard of whether it was false or true."

In our opinion, the appellants suffered no prejudice from the instruction, considered as a whole, in this regard. If there was any prejudice, it was suffered by the plaintiff, not by the defendants.

(c)

The appellants next argue that the trial court erred in its instructions by refusing to instruct in regard to the meaning of "reckless disregard of truth" under the federal constitutional standard.

In their Request to Charge No. 4 the defendants requested an instruction that "Reckless disregard of the truth is more than mere negligence on the part of the newspaper. The plaintiff must show by a preponderance of the evidence that the defendants published defamatory false statements with a high degree of awareness of their probable falsity." This instruction was requested in connection with the article in the June 9, 1966, issue of the News Review written jointly by Mr. and Mrs. Skolnik.

In our opinion, the trial court was under no obligation to give a further definition of the phrase "reckless disregard of the truth" as the phrase is sufficiently definite in itself and sufficiently presented the issue to the jury. The charge, taken as a whole, was in our opinion sufficient in this regard. As we have heretofore indicated, technical precision of individual words is not required in instructions to the jury, and if the charge as a

whole fairly presents the issue to the jury, there is no prejudicial error. *Curtis Publishing Co. v. Butts,* 388 U. S. at 156-7, 87 S. Ct. at 1992, 18 L.Ed.2d at 1112; *Jones v. Federal Paper Board Co. supra.*

(d)

Finally, the appellants contend that the trial court erred in its instructions to the jury by instructing that the defendants conceded that the publications "were not true." As already stated, there was no plea of justification, i.e., that the publications were true. Moreover, counsel for the defendants stated to the trial court:

> "What I am saying is we don't contend that the plaintiff committed blackmail, that is all. We don't intend [contend] the plaintiff committed the crime of blackmail."

The trial court instructed the jury:

> "Going to the factor of the truth, there is no contention in this case, it is conceded by the defendant these allegations were not true. That is that Mr. Bresler was guilty of blackmail.
>
> "There is no evidence before you, no contention by the defendant that they were true."

The appellants contend that the term "blackmail" in the context in which it was used was an expression of opinion regarding a public proposal. The subheading "Blackmail", however, was not used as an expression of opinion by any one other than the publishers, themselves, and had nothing whatever to do with any "public" proposal. As we have indicated the charge of blackmail was false, the appellants knew that a charge of blackmail was false, but they published it with such knowledge and emphasized the charge in a subheading with block type.

The jury could well have found that the false and defamatory statement was published with a "reckless disregard of truth" and lost any qualified privilege it might otherwise have had. Cf. *Stevenson v. Baltimore Baseball Club,* 250 Md. 482, 243 A. 2d 533 (1968).

In any event, we do not find that the appellants objected to this portion of the charge and this alleged error is not before us for consideration. Maryland Rule 554 d and e; *Jones v. Federal Paper Board Co., supra.*

Finding no prejudicial error in the rulings and charge of the trial court, the judgment will be affirmed.

*Judgment affirmed, the appellants to pay the costs.*